## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

LYDELL MARVIN BEGAY,
MARTIN ("MARTY") BEGAY,
and LORENE BEGAY,

     Plaintiff,

vs.                                                              No. CIV 15-0358 JB/SCY

UNITED STATES OF AMERICA,

     Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendant's Rule 12(b)(1) Motion to Dismiss Counts II and III for Lack of Subject Matter Jurisdiction under the Federal Torts Claim Act, 28 U.S.C. § 2671 ("FTCA"), filed February 3, 2016 (Doc. 52)("Motion"). The Court held a hearing on May 10, 2016. The primary issue is whether Count II (negligent supervision) and Count III (negligent hiring/credentialing) fall under the discretionary-function exception to the Federal Tort Claims Act, in which case the Court would need to dismiss these Counts for lack of subject-matter jurisdiction. The Motion is granted in part and denied in part. Count II is dismissed without prejudice. Count III is dismissed in part; the narrow hiring and credentialing claim pled remains, but all other hiring and credentialing claims are dismissed without prejudice.

## <u>FACTUAL BACKGROUND</u>

Plaintiff Lydell Marvin Begay is an enrolled member of the Navajo Nation and a resident of Fruitland, New Mexico. <u>See</u> First Amended Complaint for Damages ¶ 2, at 2 ("Complaint"), filed October 30, 2015 (Doc. 32). Plaintiff Martin "Marty" Begay is Lydell Begay's father. <u>See</u> Complaint ¶ 6, at 3. Plaintiff Lorene Begay is Lydell Begay's mother. <u>See</u> Complaint ¶ 7, at 3.

Defendant United States of America has direct oversight of Indian Health Services ("IHS"), a federal agency that provides health care services to members of federally recognized tribes, including the Navajo Nation. See Complaint ¶ 8, at 3-4. The Navajo Area Indian Health Service is one of twelve IHS administrative units and provides medical services at hospitals, health clinics, and health stations in New Mexico. See Complaint ¶ 8, at 3-4.

In 2012, Dr. Marrocco applied for credentials to work as an emergency room physician at Northern Navajo Medical Center in Shiprock, New Mexico. At the time of her application, Dr. Marrocco's licenses in Florida and New York were restricted as a result of her having violated Section 458.331(1)(m), (q), and (t) of the Florida Statutes for having, among other things, prescribed inappropriate and excessive quantities of controlled substances to a patient with whom she had developed a personal relationship. See Florida Board of Medicine, Final Order, Dep't of Health v. Annicol Marrocco, M.D. (Case No. 2009-06670)(June 15, 2011); New York Dep't of Health, Annicol Marrocco, M.D. (Case No. 11—06-3420-A)(Aug. 12, 2012)(consent agreement). Despite the license restrictions, IHS hired and credentialed Dr. Marrocco.

The United States Drug Enforcement Administration ("DEA") launched an investigation into Dr. Marrocco's history of prescription writing in May 2013. See Drug Enforcement Administration, Docket No. 2015-12035, at 1, filed March 15, 2016 (Doc. 59-5). The DEA immediately notified NNMC of its investigation via email. See Email from Joseph L. Cowell to Mark Strong, May 1, 2013, 9:50 A.M., filed March 15, 2016 (Doc. 59-6). IHS requested that DEA provide verification of Dr. Marrocco's active registration number on October 16, 2013. See Fax from Pamela Harrison to Brisza Rodriquez, Oct. 16, 2013, filed March 15, 2016 (Doc. 59-8). DEA responded the following day, indicating that Dr. Marrocco's DEA license was active in New York but that Dr. Marrocco did not have a DEA registration in New Mexico. See

Fax from Brisza Rodriguez to Pamela Harrison, Oct. 17, 2013, filed March 15, 2016 (Doc. 59-9).

The DEA concluded its investigation into Dr. Marrocco on May 4, 2015, denying her application

for a DEA Certificate of Registration as a practitioner.  See Drug Enforcement Administration,

Docket No. 2015-12035, at 41, filed March 15, 2016 (Doc. 59-5).

The Begays allege that, on March 6, 2014, Lydell Begay presented to the emergency

room of Northern Navajo Medical Center in Shiprock, New Mexico, where he complained of

dizziness, severe headaches, left-sided weakness, unsteadiness, and blurred vision.  See

Complaint ¶ 14, at 5.  The Begays further allege that Dr. Annicol Marrocco, M.D. examined

Lydell Begay, but failed to perform a neurological evaluation, instead diagnosing him with

conjunctivitis,[1] and prescribing him bed rest, eye drops, and ibuprofen.  According to the

Begays, Lydell Begay again presented himself to Northern Navajo Medical one week later with

similar symptoms.  When a CT scan showed that Lydell Begay had a mass in his basal ganglia,[2]

---

[1]Conjunctivitis, colloquially called "pink eye," can be viral, bacterial, or allergic in origin.  It can present medically with any combination of the following symptoms: (i) pink or red color in the white of the eye; (ii) swelling of the conjunctiva (the thin layer that lines the white part of the eye and the inside of the eyelid); (iii) increased tear production; (iv) a feeling that a foreign body is in the eye; (v) an urge to rub the eye; (vi) itching, irritation, or burning; (vii) discharge, either pus or mucus; (viii) crusting of eyelids or lashes, especially in the morning; and (ix) contact lenses that do not stay in place on the eye or that feel uncomfortable. See Centers for Disease Control and Prevention, Conjunctivitis, http://www.cdc.gov/conjunctivitis/index.html (last accessed Sept. 28, 2016).

[2]According to the leading anatomy textbook, "basal ganglia" denotes "a number of subcortical nuclear masses that lie in the inferior part of the cerebral hemisphere, in close relationship with the internal capsule."  Susan Standring, Gray's Anatomy: The Anatomical Basis of Clinical Practice at 364 (41st ed. 2015)("Gray's Anatomy").  Nowadays the term is "restricted to the corpus striatum and, according to some authorities, other nuclei in the diencephalon and midbrain . . . that collectively form a functional complex involved in the control of movement and motivational aspects of behaviour."  Gray's Anatomy, supra at 364.  "Disorders of the basal ganglia are principally characterized by abnormalities of movement, muscle tone and posture.  There is a wide spectrum of clinical presentations ranging from poverty of movement and hypertonia at one extreme . . . to abnormal involuntary movements at

he was rushed to the University of New Mexico Hospital in Albuquerque, New Mexico, via air

transport.  Twenty-four hours later, he suffered a stroke with localized brain death that resulted

in paralysis, the need for intubation and respiratory support, and loss of speech.  See Complaint ¶

14-20, at 5-6.

Dr. Marrocco, who treated Lydell Begay during his first visit to the emergency room and

who diagnosed him with conjunctivitis, was an independent contractor with the IHS pursuant to

a non-personal services contract under Federal Acquisition Regulation ("FAR") 37.101.[3]  She

was an experienced emergency room doctor, but she was not licensed to practice medicine in the

State of New Mexico, and she was acting under licenses that the States of Florida, New York,

and Pennsylvania had restricted.  Those states' medical boards had restricted her license after Dr.

_____

the other."  Gray's Anatomy, supra at 364.  "The basal ganglia might be said to guide intention
into action. As far as their role in movement control is concerned, they appear to promote and
support patterns of behavior that are appropriate in the prevailing circumstances and to inhibit
unwanted or inappropriate movements." Gray's Anatomy, supra at 370.
      The extensive anatomical terminology in this definition demands its own glossary.
Unless otherwise cited, all definitions in the remainder of this paragraph come from the
Merriam-Webster Medical Dictionary, available online at http://www.merriam-webster.com
/medical. The "cerebral cortex" is the convoluted surface layer of gray matter of the cerebrum
that functions chiefly in coordination of sensory and motor information. A "subcortical nuclear
mass" refers to a nuclear mass located beneath the cerebral cortex. The "internal capsule" is a
layer of white matter in the cerebrum that consists largely of fibers passing to and from the
cerebral cortex.  The "corpus striatum" refers to either of a pair of masses of nervous tissue
within the brain that contain large nuclei of gray matter separated by sheets of white matter. The
"diencephalon" is a posterior subdivision of the forebrain.  "Hypertonia," sometimes called
"spasticity," refers to abnormally increased muscle tone of symptomatic muscles that can lead to
muscle rigidity, reduced motor function, stiff joints, and difficulties with balance. See National
Institute of Neurological Disorders and Stroke, National Institutes of Health, "Hypertonia," http:
//www.ninds.nih.gov/disorders/hypertonia/hypertonia.htm (last accessed Sept. 28, 2016).

[3] Under FAR 37.101, a non-personal services contract means a contract under which the
personnel rendering the services are not subject, either by the contract's terms or by the manner
of its administration, to the supervision and control usually prevailing in relationships between
the Government and its employees."  FAR 37.101.  IHS selected Medicus Healthcare Solutions,
LLC, as a service provider for Northern Navajo Medical, meaning that hiring of independent
contract physicians such as Dr. Marrocco took place through Medicus Healthcare Solutions.

Marrocco had prescribed excessive quantities of controlled substances -- up to 1,350 tablets of narcotics in a single day -- to a patient with whom she had developed a personal relationship.

## PROCEDURAL BACKGROUND

This case is a medical malpractice action that Lydell Begay and his parents, M. Begay and Lorene Begay, have brought pursuant to the FTCA. The Begays are suing Defendant United States of America for injuries that they allegedly received as a result of medical care that Northern Navajo Medical provided in March, 2014. On April 28, 2015, Lydell Begay filed his first Complaint. See Complaint for Damages, filed April 28, 2015 (Doc. 1)("Original Complaint"). The Begays filed the Amended Complaint on October 30, 2015. See First Amended Complaint for Damages, filed October 30, 2015 (Doc. 32)("Complaint").[4]

Lydell Begay asserts three causes of action against Defendant United States of America that they contend, through its Department of Health and Human Services, has direct oversight of the Indian Health Service ("IHS"), which provides health services to members of the Navajo Nation; (i) medical negligence, see Complaint ¶¶ 28-39, at 7-10 (Count I); (ii) negligent supervision, see Complaint ¶¶ 40-50, at 10-12 (Count II); and (iii) negligent hiring/credentialing,

---

[4]The United States filed the Motion on October 16, 2015, against the Original Complaint, filed April 28, 2015 (Doc. 1). See Motion at 1; Original Complaint at 1. The Court will cite, however, to the Amended Complaint, which the Begays filed on October 30, 2015, after the United States filed the Motion. See Complaint at 1; Motion at 1. The Court will refer to the Amended Complaint as "the Complaint" throughout this Memorandum Opinion and Order. The only difference between the Original Complaint and the Amended Complaint is that the Complaint adds Martin ("Marty") Begay and Lorene Begay as Plaintiffs. See Original Complaint at 1; Complaint at 1. The Complaint also adds a loss of consortium claim on M. and Lorene Begay's behalf. See Complaint ¶¶ 63-69, at 14.

see Complaint ¶¶ 51-62, at 12-14 (Count III).  M. Begay and Lorene Begay assert a cause of loss

of consortium/society,[5] see Complaint ¶¶ 63-69, at 14 (Count IV).


1.      **Motion Under Rule 12(b)(1) of the Federal Rules of Civil Procedure to Dismiss Counts II and III for Lack of Subject-Matter Jurisdiction.**

The United States moves the Court to dismiss Counts II and III of the Begays' Complaint

-- negligent supervision and negligent hiring/credentialing -- on the grounds that the Court lacks

subject matter jurisdiction over these claims.  See Motion at 1.  The United States contends that

IHS' hiring, credentialing, and supervision of Dr. Marrocco qualify as discretionary functions

under the FTCA.  See Motion at 3.  If hiring, credentialing, and supervision are discretionary

functions under the FTCA, the United States argues that the Court lacks subject-matter

jurisdiction over Counts II and III.  See Motion at 3.

a.      **Discretionary Actions.**

The United States acknowledges that sovereign immunity is not absolute.  See Motion at

3.  Under the FTCA's terms, the United States can be held liable for damages if a United States

employee negligently performs his or her mandated duty within the scope of his or her

employment.  See Motion at 3.  The United States contests, however, that if the same employee

undertakes a discretionary function, the United States cannot be liable for any consequences of

that discretionary function.  See Motion at 3-4.

According to the United States, the IHS' actions when it hired, credentialed, and

supervised Dr. Marrocco qualified as such discretionary functions.  See Motion at 7-8.  The

United States insists that, contrary to what the Begays assert in their Complaint, see Complaint ¶

---

[5]The loss of consortium claim is asserted on M. Begay's and Lorene Begay's behalf.  See Response at 8.

48, at 11, the Indian Health Manual preserves IHS discretion over hiring personnel by allowing the Area Director to grant exceptions to normal licensing requirements for credentialing on a case-by-case basis.  See Motion at 7.  Additionally, the United States maintains, nothing in the I.H.M. or Dr. Marrocco's contract sets forth mandatory supervision requirements for independent contractor physicians such as Dr. Marrocco.  See Motion at 7-8.

The United States further insists that decisions regarding hiring IHS personnel are inherently discretionary at both the individual and organizational level; the Area Director must weigh his or her choices among several prospective employees and decide at what level to staff individual hospitals, centers, and clinics.  See Motion at 10.  The United States asserts that this discretion is particularly pronounced when IHS hires independent contractors such as Dr. Marrocco, as the Area Director first must adjudge whether existing civil service employees can provide the required services and whether contracting provides the best possible value proposition.  See Motion at 11-12.

The United States likewise insists that supervisory decisions are inherently discretionary. See Motion at 7.  It admits that IHS reserved a right to inspect Dr. Marrocco's work and to subject her qualifications and credentials to review.  See Motion at 8.  Yet it invokes out-of-Circuit courts to suggest that such reserved rights do nothing to create mandatory directives for FTCA purposes.  See Motion at 8 (citing Grogan v. United States, 341 F.2d 39, 42 (6th Cir. 1965) and Hudson v. United States, 2008 WL 517009, at *7 (E.D. Tenn. Feb. 25, 2008).

       **b.**     **The Decision to Engage an Independent Contractor Is Exactly the Kind of Decision that the Discretionary Function Exception Was Designed to Shield.**

The United States contends that IHS' conduct when it hired, credentialed, and supervised Dr. Marrocco was more than just discretionary; it was the very exemplar of the sort of on-the-

ground policymaking that Congress intended to shield from suit when it passed the FTCA.  See Motion at 10.  The United States argues that IHS' mission is to raise the physical, mental, social, and spiritual health of American Indians to the highest level.  See Motion at 11.[6]  According to the United States, IHS sometimes must reach outside its ranks to hire independent contractors to meet this raison d'être, and the FARs referenced within the Indian Health Manual give Area Directors wide latitude to exercise business judgment in ensuring effective contracting.  See Motion at 12 (citing 48 C.F.R. § 1.102 & 1.602-2).

Once IHS hires a contractor, the United States asserts, its supervision of this contractor also goes to the heart of why Congress passed the FTCA.  See Motion at 12-13.  How an agency supervises and evaluates those it hires is susceptible to large set of financial, social, and policy considerations.  The United States maintains that, regardless of whether an agency correctly calibrates its evaluations or astutely assesses how to supervise those on its payroll, Congress wished to shield the agency from any judicial "second-guessing."  Motion at 10, 12-14 (quoting Tonelli v. United States, 60 F.3d 492, 496 (8th Cir. 1995).

**2.      Response to United States of America's Rule 12(b)(1) Motion to Dismiss Counts II and III for Lack of Subject Matter Jurisdiction, filed March 14, 2016 (Doc. 57).**

The Begays responded to the United States' Motion on March 14, 2016.  See Plaintiff's Response to United States of America's Rule 12(b)(1) Motion to Dismiss Counts II and III for Lack of Subject Matter Jurisdiction; Fed. R.Civ. P. 56(d) Declaration, filed March 14, 2016 (Doc. 57)("Response").  In that filing, the Begays argue that the Court should reject the Motion

---

[6]The Motion does not offer a source describing this duty, but the United States seems to locate this mission within the IHS mission statement, available online at https://www.ihs.gov/aboutihs /overview/ (last accessed Sept. 28, 2016)( ("Our Mission… to raise the physical, mental, social, and spiritual health of American Indians to the highest level.")(ellipses used stylistically in the original).

to dismiss Counts II and III.  The Court should reject the Motion, because the conduct challenged under those Counts was not discretionary and did not implicate the social, economic, and public policy considerations that Congress seeks to shield via the FTCA.  See Response at 4.

> ### a.   The Begays' Contention that the Challenged Conduct is Not Discretionary.

Like the United States in its Motion, the Begays begin their argument with an observation that sovereign immunity is not absolute.  See Response at 2.  Compare Motion at 3.  From that point, the Response and the Motion diverge.  Whereas the United States argues in its Motion that IHS' conduct in this case clearly falls within the discretionary-function exception, the Begays argue just as strongly that the exception does not apply.  See Response at 5-6.  The Begays contend that the Indian Health Manual ("I.H.M.") imposed a mandatory and specific course of conduct on IHS when it hired, credentialed, granted staff privileges to, and retained Dr. Marrocco.  See Response at 7.  Regarding hiring and credentialing, the Begays assert that I.H.M. 3-1.4(C)(5) expressly forbids IHS from granting clinical privileges to medical staff with restricted licenses unless the Area Director authorizes it on a case-by-case basis.  See Response at 8.  Regarding supervision, the Begays contend that the I.H.M. requires IHS to review staff performance near the end of their one-year probationary period.  See Response at 8 (citing I.H.M. 3.1.4(E)).

The Begays allege that IHS violated these staffing policies when it hired and credentialed Dr. Marrocco, despite restrictions on her license in three states and an ongoing Drug Enforcement Administration ("DEA") investigation into her history of prescription writing.  See Response at 8-11.  The Begays allege that, not only did IHS grant Dr. Marrocco medical staff and clinical privileges in apparent contravention of I.H.M. 3-1.4(C)(5), but IHS doubled down on

its violation by failing to involve Area Director John Hubbard in the decision.  See Response at 12. The Begays then accuse IHS of tripling down on the violation by granting Dr. Marrocco clinical privileges despite knowing that she had professional liability claims, suits, and/or judgments pending against her.  See Response at 12

According to the Begays, IHS continued to violate the I.H.M. when it renewed Dr. Marrocco's staff membership and clinical privileges at the end of 2013.  See Response at 14. The I.H.M. indicates that IHS is to review new hires' performance near the end of their initial probationary year.  See Response at 14 (citing I.H.M. 3.1.4(E)).  Yet the Begays contend that there is no evidence that IHS conducted any performance evaluation on Dr. Marrocco before it renewed her staff privileges for a second year.  See Response at 14.

Moreover, the Begays maintain that IHS violated its own rules by failing to comply with Joint Commission standards for credentialing staff.  See Response at 15.[7]  The Joint Commission -- an independent nonprofit organization that accredits and certifies nearly 21,000 health care organizations and programs in the United States -- requires that organizations evaluate their personnel using "an objective, evidence-based process."  Response at 15.  The Begays assert that IHS violated this standard when is failed to use any defined criteria or requirements for monitoring and evaluating Dr. Marrocco's performance.  See Response at 15-16.

b. **The Begays' Contention that Challenged Conduct Does Not Implicate Public Policy.**

Turning to respond to the United States' second argument, the Begays insist that IHS' conduct vis-à-vis Dr. Marrocco does not implicate public policy.  See Response at 17.  The

---

[7]The Begays do not specifically identify the primary source for these standards. They appear to refer to the 2014 JOINT COMMISSION MEDICAL STAFF STANDARDS. This edition currently is out of print. The updated digital 2016 version of the same manual is available online with a subscription at http://www .jcrinc.com/e-dition/.

Begays set up this argument by way of an analogy to federal car leasing programs.  <u>See</u> Response at 18.  They argue that the initial decision to choose one leasing company over another is a discretionary decision susceptible to policy analysis.  <u>See</u> Response at 18.  The Begays contend that, after an agency has signed the lease, however, the decision to use a particular defective vehicle that the leasing company provides does not rise to the level of policy analysis that implicates "legislative and administrative decisions grounded in social, economic, and political policy" which Congress intended the discretionary-function exception to shield.  Response at 18 (quoting <u>United States v. Varig Airlines</u>, 467 U.S. 797, 814 (1984)).  Similarly, the Begays argue, IHS' decision to hire and credential Dr. Marrocco within an existing program did not entangle IHS in big questions about policy. <u>See</u> Response at 18-19.

Intermixed with the previous argument, the Begays take specific aim at one of the United States' case citations, <u>Sydnes v. United States</u>, 523 F.3d 1179 (10th Cir. 2008).  <u>See</u> Response at 18-19.  The Begays do not challenge the United States' reading of the case, <u>i.e.</u> that a policy must be defined and specific to be considered mandatory conduct under the FTCA.  <u>See</u> Response at 18-19; Motion at 10.  The Begays insist, however, that <u>Sydnes v. United States</u> applies only to employees -- not to independent contractors such as Dr. Marrocco.  <u>See</u> Response at 18.  The Begays cite cases where, they allege, the United States fails to note this employee-contractor distinction in its Motion.  <u>See</u> Response at 19 (citing <u>Hudson v. United States</u>, 2008 WL 517009, at *7; <u>Williams v. United States</u>, 50 F.3d 299 (4th Cir. 1995); and <u>Layton v. United States</u>, 984 F.2d 1486 (8th Cir. 1993)).  They then revisit this argument near the Response's end, arguing that IHS' expansive interpretation of the discretionary-function exception would swallow the entirety of the FTCA's liability rule, <u>see</u> Response at 21-22, and that courts have held multiple times that federal agency hiring and retention decisions do not fall within the discretionary-

function exception even for employees when the federal agency knew or should have known about illegal behavior, see Response at 22-23 (citing Brons v. United States, 2015 WL 630433 (N.D. Ga. 2015); Tonelli v. United States, 60 F.3d 492, 496 (8th Cir. 1995); Peterson v. Miranda, 991 F. Supp. 2d 1109 (D. Nev. 2014); and Doe v. Estes, 926 F. Supp. 979 (D. Nev. 1996)).

The Begays admit to being uncertain how to fit their final argument in the mosaic of their Response.  See Response at 20.  In an apparent effort to hedge their bets, the Begays argue that IHS did not have the discretion to fail to exercise due care when it credentialed and retained Dr. Marrocco even if it had discretion to hire her. See Response at 20-21. The Begays allege that IHS' purported lack of due care was a violation of its policy under I.H.M. 3-1.1 and did nothing to advance governmental policy.  See Response at 21.

### c.      Conditional Request for Additional Discovery.

If the Court finds in favor of the United States on its Motion, the Begays ask that they be permitted under rule 56(d)92) of the Federal Rules of Civil Procedure to take depositions of those individuals identified in response to Plaintiffs' Interrogatory No.1, Plaintiff's First Set of Interrogatories and Request for Production, filed March 15, 2016 (Doc. 58-1).  See Response at 24.  The Begays assert that the discretionary-function exception is not a threshold question that the Court must decide before allowing such discovery, because Bell v. United States, 127 F.3d 1226, 1228 (10th Cir. 1997), held that the exception involves both jurisdictional and merits issues, and that, in such a case, a motion to dismiss should be treated as a motion for summary judgment.  See Response at 23-24 (also citing Franklin Savings Corp. v. United States, 180 F.3d 1124, 1129-30 (10th Cir. 1999)).

### 3.      United States' Reply.

The United States replied to the Response on April 11, 2016. See United States of

America's Reply to Its Motion to Dismiss Counts II and III for Lack of Subject Matter Jurisdiction, filed April 11, 2016 (Doc. 60)("Reply").  Structurally, it divides the Reply into four arguments.  These arguments run as follows: that (i) the Begays have failed to identify specific mandates that governed IHS' interactions with Dr. Marrocco; (ii) IHS' personnel decisions are susceptible to policy analysis; (iii) the United States need not demonstrate "due care" under the discretionary function exception; and (iv) discovery is not needed because the Court lacks subject matter jurisdiction.

### a.     Specific and Mandatory Course of Action.

The United States contends that the Begays, their frequent invocations of the I.H.M. notwithstanding, fail to identify any specific and mandatory IHS directive in the Response.  See Reply at 2.  According to the United States, the I.H.M. explicitly allows exceptions to its rules and recognizes that the decision to award clinical privileges to an independent contractor involves the exercise of judgment.  See Reply at 2-3.  Even if the Area Director delegates the decision to subordinates, the United States maintains, it is the nature of the conduct -- not the status of the decision maker -- that governs whether the discretionary-function exception applies in a given case.   See Reply at 2-4.

### b.     Decisions by IHS Personnel Susceptible to Policy Analysis.

The United States further argues that the Begays' efforts to rebut the Motion's assertion that IHS personnel decisions are susceptible to policy analysis are unsuccessful.  According to the United State, the Begays rely on an idiosyncratic and incorrect reading of Sydnes v. United States in an attempt to distinguish the extent of discretion that IHS enjoyed when hiring employees versus independent contractors.  See Reply at 5.  According to the United States, a sophisticated reading of the case unearths no basis for distinguishing between the two groups.

See Reply at 5.

Searching elsewhere to discern whether the distinction actually exists, the United States first turns to the only case it argues is on point -- an out-of-circuit district court case in Tennessee.  See Reply at Hudson v. United States, 2008 WL 517009, at *7 (E.D. Tenn. 2008). The court in that case, the United States insists, found that the discretionary-function exception did in fact apply in a case challenging the selection and supervision of a contracting physician whose clinical privileges were subject to review by the contracting government agency.  See Reply at 5 (citing Hudson v. United States, 2008 WL 517009, at *7 (E.D. Tenn. 2008).  The United States then turns to an a fortiori argument for further support, speculating that it stands to reason that the discretionary-function exception must apply to independent contractors if it applies to employees, as an agency has to grapple with more policy considerations with the former than with the latter.  See Reply at 5-6.

According to the United States, the discretionary-function exception even withstood any IHS failure to act after it became aware of Dr. Marrocco's allegedly negligent practice of medicine in Florida.  See Reply at 6.  The Begays might invoke Brons v. United States to argue otherwise, the United States asserts, but the logic of Brons v. United States does not apply to this case, as (i) Dr. Marrocco's license was revoked two years after Northern Navajo Medical engaged her services; and (ii) Dr. Marrocco never needed a DEA license to work there.  See Reply at 6.

### c.     The Need to Demonstrate "Due Care" Under the Discretionary-Function Exception.

The United States rejects out of hand the Begays' assertion that IHS had a duty of care with respect to its hiring, credentialing, and retention of Dr. Marrocco.  See Reply at 7.  It first

turns to the text of 28 U.S.C. § 2680(a), which reads as follows:

> any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).  According to the United States, the key word in the text is the disjunctive "or."  See Reply at 7-8.  These two letters, the United States contends, separate the code provision into two distinct exceptions to the FTCA -- the first applying exclusively to mandates and the second applying exclusively to discretionary functions.  See Reply at 7-8.  The text, as the United States reads it, saddles only the former -- mandatory functions -- with a duty of care. See Reply at 7-8.

    Having offered its interpretation of the text of the statute, the United States then seeks to counter the appearance that this interpretation is at loggerheads with United States Supreme Court precedent. See Reply at 8.  The Begays implicitly argued as much by invoking Indian Towing v. United States, 350 U.S. 61 (1955), in the Response.  See Response at 20-21.  The United States spotlights, however, two mistakes that the Begays allegedly make by relying on that case about a lighthouse.  See Reply 8-9.  First, the issue at stake was not the discretionary function.  See Reply 8-9 (citing Harrell v. United States, 443 F.3d 1231, 1236 (10th Cir. 2006)). Second, subsequent Supreme Court decisions have foreclosed the distinction that Indian Towing made between high-level policy setting and low-level operational decisions.  See Reply at 9 (citing United States v. Gaubert, 499 U.S. 315, 325 (1991)).

    d.    **Discovery.**

    Finally, the United States argues that the Begays' conditional request for additional

discovery is premature.  See Reply at 10-13.  The United States maintains that, the Begays' assertions notwithstanding, the question about jurisdiction in this case is a threshold issue.  See Reply at 10.  According to the United States, if the Court determines that it lacks jurisdiction, then any alleged IHS negligence is irrelevant and the Begays may not launch a fishing expedition into IHS files.  See Reply at 10.

The United States insists that the cases that the Begays adduce to support their request are easy to distinguish from this case.  According to the United States, Bell v. United States revolved around whether discretion was built into particular contract terms, and so it was necessary to examine the contract to decide the jurisdictional question.  See Reply at 11.  Franklin Savings Corp., the United States contends, resulted in dismissal under rule 12(b)(6) without discovery, because the plaintiff's claims fell within the FTCA's discretionary-function exception.  See Reply at 11.

The United States maintains that the Tenth Circuit has come to a conclusion that it opposite what the Begays contend.  See Reply at 10.  In Sydnes v. United States, the United States asserts, the Tenth Circuit warned against conflating merits claims with jurisdictional ones.  See Reply at 11 (citing Sydnes v. United States, 523 F.3d at 1184).  In Price ex rel. Price v. W. Res., Inc., 232 F.3d 779, 784 (10th Cir. 2000), the United States maintains, the Tenth Circuit held that there is no requirement that all discovery be completed before summary judgment.  See Reply at 12 (citing Price ex rel. Price v. W. Res., Inc., 232 F.3d at 784).  In Jensen v. Redey. Agency of Sandy City, the United States says, the court held that discovery would not be allowed for any information sought that was irrelevant to the summary judgment motion.  See Reply at 12 (citing Jensen v. Redey. Agency of Sandy City, 998 F.2d 1550 at 1553-54).

4.      __The Hearing__.

The Court held a hearing on May 10, 2016.  <u>See</u> Transcript of Hearing (taken May 10, 2016).  The parties largely stuck to their briefing.  The Court's citation to the transcript of the hearing refers to the court reporter's original, unedited version.  Any final version may have slightly different page and/or line numbers.

a.      __The Defendants__.

The United States first reiterated its belief that IHS' actions vis-à-vis Dr. Marrocco fall under the discretionary-function exception to the FTCA, as nothing with "the weight of congressional legislation" mandated a specific course of action that IHS needed to take when retaining her.  Tr. at 6:2-20 (Langenwalter).  The United States contended that neither the I.H.M. guidelines nor the Joint Commission's standards can manufacture such a mandate in the face of such statutory silence.  <u>See</u> Tr. at 6:15-7:9 (Langenwalter).  Moreover, the United States maintained, clear and multiple policy considerations place the IHS actions squarely within the scope of conduct that the FTCA was designed to shield.  <u>See</u> Tr. at 7:9-20 (Langenwalter).  The United States contended that these considerations were no less pronounced for IHS when it decided to hire Dr. Marrocco than when it selected Medicus Healthcare Solutions, LLC, as the contract service provider.  <u>See</u> Tr. 7:20-8:12 (Langenwalter).

The United States quickly registered its objection to the Begays' request to expand discovery.  <u>See</u> Tr. 8:12ff.  According to the United States, "[t]here is nothing that the Plaintiff could seek to discover at this point that would change the Court's analysis" of subject-matter jurisdiction over Count II and Count III.  Tr. at 8:15-17 (Langenwalter).  According to the United States, the Begays' requested depositions would not reveal what policy considerations the deponents weighed when they were deciding whether to hire Dr. Marrocco.  <u>See</u> Tr. at 8:17-25.

The United States' initial statement having concluded, the Court noted that almost any governmental action has some element of discretion in it and that the State of New Mexico clearly would allow the cause of action to go forward in this case.  See Tr. at 9:8-13 (Court). The Court then asked the United States how it could defend saying that this case involves discretion and shields the United States from liability when other causes of action have been allowed to proceed.  See Tr. at 9:13-16 (Court).

Responding to the Court's question, the United States indicated that an unspecified case says that state common law cannot create a mandatory directive for the United States and cannot serve as the basis of the first prong of the Berkovitz v. United States, 486 U.S. 531 (1988), test for discretionary conduct.  See Tr. at 9:16-20 (Langenwalter).  Furthermore, the United States argued, a long line of cases have held that employee supervision and retention is conduct that the discretionary function seeks to shield because of the policy considerations that these entail.  See Tr. at 10:2-12, 10:21-11:17 (Langenwalter).  The sole exception from this rule is in cases of battery or sexual assault.  See Tr. at 10:12-16 (Langenwalter).  Neither of which is there anything in Dr. Marrocco's record suggesting there was such a risk in hiring her.  See Tr. at 10:12-21 (Langenwalter).

  **b.**  **The Plaintiffs.**

The Court noted that it was troubled that those living on reservations seem to have less ability than those living off of them do to sue negligent doctors and hospitals.  See Tr. at 11:25-12:4 (Court).  It asked the Begays, however, how it could write an opinion adopting the Begays' position on the extent of the discretionary-function exception when a fair number of cases -- including at the Tenth Circuit -- hold that hiring, supervision, and retention decisions fall within the exception's scope.  See Tr. at 12:4-12 (Court).

The Begays seconded the Court's concern about equal protection under the law for American Indians and keelhauled the United States for attempting to exonerate itself of any responsibility behind an excuse that Dr. Marrocco was an independent contractor.  <u>See</u> Tr. at 12:14-21.   Confirming the Court's impression that the main cause of concern about Dr. Marrocco's professional background was her immoderate prescription of narcotics, the Begays painted a dark picture of her alleged professional incompetence and the risk at which IHS placed its patients when it hired her.  <u>See</u> Tr. at 12:24-14:4 (Court)(Cohen).  The Begays then pilloried Dr. Marrocco as untruthful, dangerous, erratic, unethical, and unprofessional.  <u>See</u> Tr. 14:4-13 (Cohen).

Prepared to assume that the Begays had adequately alleged negligent hiring, the Court asked the Begays why they needed more discovery if they already had so much information and whether the real question is whether the discretionary-function exception to the FTCA applies to the case.  <u>See</u> Tr. at 14:14-24 (Court).  The Begays indicated that extra discovery could prove especially beneficial with regards to the negligent credentialing claim, as they did not yet understand the full picture of IHS policies for credentialing.  <u>See</u> Tr. at 14:25-15:21 (Cohen). When the Court indicated that this rationale spoke more to how strong the Begays could make their case than to the legal analysis required, the Begays acknowledged that they would be able to prove their point even without the additional discovery.  <u>See</u> Tr. at 15:22-16:9 (Court)(Cohen).

The Court then returned the colloquy to its earlier question how to write an opinion that would stand athwart so much precedent.  <u>See</u> Tr. at 16:10-15 (Court).  Alacritous to take up the challenge, the Begays suggested two sections for the opinion.  The first section, the Begays proposed, would note that courts nationwide have held that federal agencies do not have the discretion to violate their own policies.  <u>See</u> Tr. at 16:20-25.  The second section, the Begays

offered, would indicate that this is a case of first impression, as no case law in the country has focused on the specific issue of FTCA liability when an agency credentials a physician. See Tr. at 17:3-6 (Cohen).

By the Court's leave, the Begays then delved more deeply into the arguments that could flesh out the hypothetical opinion's first section. See Tr. at 17:15-18:16 (Cohen)(Court)(Cohen). They argued that any federal statute, regulation, or policy that specifically prescribes a course of action for an employee to follow precludes later application of the discretionary-function exception. See Tr. at 17:19-18:3 (Cohen). According to the Begays, the federal government had prescribed a specific course of action vis-à-vis Dr. Marrocco; ergo, the discretionary function exception does not apply. See Tr. at 18:10-16 (Cohen).

The Court noted that the Begays were focusing disproportionately on the credentialing issue and suggested that it was the strongest of the Begays' three claims. See Tr. at 18:17-19:2 (Court). The Begays conceded as much, (i) recasting the conflated "hiring/credentialing" claim -- Count III -- as just a credentialing claim; and (ii) allowing that the supervision claim likely could not survive the discretionary-function exception. See Tr. at 19:3-20 (Cohen).

Pivoting to what they just had divulged was their strongest claim, the Begays disserted on credentialing. See Tr. at 19:20-37:22 (Cohen). They proffered a copy of the I.H.M. to the Court and then quoted the following language from it: "In general, providers with any restrictions on any state licenses, certification or registration will not be granted medical staff membership or clinical privilege." Tr. at 20:1-12 (Cohen). The Begays maintained that this language "establishes a baseline prohibition against the credentialing of any physician with any restriction on any license" and that only the Area Director can override this prohibition. Tr. at 20:12-21:1 (Cohen). The Begays identified patient safety as the singular purpose of this prohibition,

plodded through the restrictions that New York and Florida had placed on Dr. Marrocco's license, and asserted that IHS knew about these restrictions.  See Tr. at 21:3-22:19 (Cohen).  As a "kicker," as the Begays termed it, the Navajo Nation Medical Center violated I.H.M. policy by failing to even consult the Area Director, John Hubbard, on the credentialing decision.  Tr. 23:22-25:2 (Cohen).

The Begays then turned the Court's attention to what they asserted is the only case nationwide that has looked at the question of negligent credentialing.[8]  In that case out of the federal district court in Maine,[9] the Begays maintain, the court denied the United States' motion for summary judgment on the discretionary-function exception, because it was unclear whether the challenged agency had followed its own credentialing guidelines.  See Tr. 25:6-26:1 (Cohen). The Begays assert that the case suggests it is even less likely that Dr. Marrocco's credentialing falls under the discretionary-function exception given that -- unlike in the Maine case -- IHS' failure to follow its guidelines is not even in dispute.  See Tr. at 26:2-13 (Cohen).

The United States, the Begays observed, puts forth three arguments why the

---

[8]The Court has sought to verify this assertion by means of an exhaustive search of both case law and law journals on LEXIS.  The Court has not found another federal case in which the question of negligent credentialing was decided on its merits. Even though numerous federal courts have encountered the negligent credentialing claim under the FTCA, all have dismissed the argument for failure to exhaust administrative remedies, for procedural error, or for being premature.  See, e.g., Lopez v. United States, 823 F.3d 970 (10th Cir. 2016)(overturning district court's conclusion that it had jurisdiction to decide a negligent credentialing claim when there was a notice failure); Hays v. Smith, 2016 U.S. Dist. LEXIS 131544, at *20 (W.D. La. Sept. 23, 2016)(Foote, J.)(noting that negligent credentialing claim was premature); (Delaney v. United States, 2015 U.S. Dist. LEXIS 97963, at *13-15 (D.S.C. July 28, 2015)(Norton, J.)(noting the plaintiff's failure to exhaust administrative remedies); Rudisill v. United States, 2014 U.S. Dist. LEXIS 122043, at *6 (E.D.N.C. Sept. 2, 2014)(Fox, J.); Olvera v. Kaweah Delta Dist. Hosp., 2009 U.S. Dist. LEXIS 5832 *11 (E.D. Cal. Jan. 16, 2009)(Ishii, J.)(same).

[9]The Begays did not identify the name of the case during the hearing.  It is Brandt v. United States Department of Veterans Affairs, et al., 2000 WL 1879806 (D.Me.)

- 21 -

discretionary-function exception does not apply to IHS' credentialing of Dr. Marrocco, none of which the Begays find to be convincing.  See Tr. at 26:13-15 (Cohen).  The United States' first argument, according to the Begays, is that IHS lacked a specific directive for the challenged conduct, but the Begays contested that both cases the United States references for support are easy to distinguish from this case, because neither implicates the kind of specificity found in the I.H.M.  See Tr. at 26:15-29:2 (Cohen).  The United States' second argument, according to the Begays, is that the decision to credential Dr. Marrocco remained discretionary even if the Area Director delegated it to someone else, which the Begays dismissed as both a straw man and a red herring.  See Tr. at 30:9 (Cohen).  The United States' third argument, according to the Begays, is that IHS' discretion was abused.   See Tr. at 31:12-13 (Cohen).   The Begays say that, contrariwise, there was not an abuse of discretion; rather, the IHS failed to follow a policy that "on its face is designed to protect patients' safety."  Tr. at 31:13-22 (Cohen).

Then circling back around to the Court's question how to write a hypothetical opinion in this case, the Begays revised their earlier proposal, suggesting a different bipartite structure.  See Tr. at 31:23-32:16 (Cohen).  In the opinion's first part, according to the Begays, the Court would say that the United States never has discretion to violate one of its own policies.  See Tr. at 31:22-32:13 (Cohen).  In the opinion's second part, according to the Begays, the Court would indicate that credentialing is not the conduct that the narrow discretionary function exception was designed to protect, because credentialing fails to implicate budgetary considerations, social policy, or any other hallmark of a significant public policy decision.  See Tr. at 32:13-35:22 (Cohen).

The Begays thereafter provided some further details they envisioned falling into the second section of a hypothetical opinion.  See Tr. at 36:1-37:21 (Cohen).  They said that there

are "levels of conduct" that have discretion to them, but that these levels do not encompass every possible action.  Tr. at 36:1-5 (Cohen).[10]  For instance, the Begays explained, IHS' contracting with Medicus Healthcare Solutions, LLC, as a service provider was unassailably discretionary, but that making credentialing decisions at the individual level was more akin to doing a routine inspection on a car or airplane, i.e. a mechanistic exercise in administration that does not involve "the kind of discretion that the discretionary-function exception is designed to protect."  Tr. at 36:6-37:21 (Cohen).

The Court then asked the United States for its critique of the hypothetical opinion the Begays had proposed, see Tr. at 37:25-38:4 (Court), asking it to focus specifically on (i) whether the I.H.M. set forth mandatory directives for credentialing; and (ii) whether the Area Director Hubbard could delegate the power to make exceptions to these directives.  See Tr. at 38:16-40:5 (Court)(Langenwalter)(Court).  The United States averred that the Area Director could delegate this authority, and the Court challenged it to provide a source for that delegation authority.  See Tr. at 40:6-16 (Langenwalter)(Court)(Langenwalter)(Court).  Struggling to remember a specific provision, the United States asserted that it is commonplace within the federal government to delegate authority on personnel policies.  See Tr. at 40:17-41:4 (Langenwalter).

After a short recess, the United States continued its rebuttal, indicating that the I.H.M. should not be considered a federally mandated regulation, statute, or policy for the purposes of the Berkovitz test.  See Tr. at 42:24-43:21 (Court)(Langenwalter).  Unconvinced, the Court asked why the manual should not be considered policy.  See Tr. at 43:22-44:2 (Court).  The United States responded that (i) the FTCA itself is a very limited waiver to sovereign immunity;

---

[10]It is unclear from the transcript whether the Begays meant this turn of phrase to mean (i) that discretion extends to many different individuals at different levels of authority; or (ii) that discretion extends to many different kinds of conduct.

(ii) the discretionary-function exception is narrower still, meant to "prevent litigants from stepping on the directives that have been set by legislative policy through Congress;" and (iii) these directives are limited to the Code of Federal Regulations and agency policies, not lower-level "guidelines and procedural directives that are issued every day for employees for performing their everyday duties."  Tr. at 44:3-23 (Langenwalter).

Still not convinced that the I.H.M. failed to clear the bar to be considered a policy under Berkovitz, the Court switched gears and asked the United States what else was wrong with the Begays' hypothetical opinion.  See Tr. at 44:25-45:10 (Court).  The United States responded by returning to its point that there was no mandatory credentialing directive in the I.H.M. and read the first paragraph of I.H.M. 3-1.4(C)(5) into the record.  See Tr. at 45:11-48:17 (Langenwalter). The United States summarized the paragraph as saying that medical staff "must hold an active and unrestricted state license."  Tr. at 47:17-18 (Langenwalter).  The United States admits that IHS was aware that Dr. Marrocco had restrictions on her New York and Florida licenses, but insists that Dr. Marrocco had an unrestricted Pennsylvania license at the time IHS was deciding whether to credential her.  See Tr. at 48:20-50:6 (Langenwalter).  Since Dr. Marrocco had an unrestricted license, the United States argued, it was not even necessary for the Area Director to approve an exception for her.  See Tr. at 50:4-51:2 (Langenwalter).

The Court asked the United States how its interpretation of the first paragraph of I.H.M. 3-1.4(C)(5) retained any discretion, as it would allow IHS to credential a doctor whose license had been restricted in forty-nine states but was unrestricted in one state.  See Tr. at 4-12 (Court). The United States responded that the second paragraph makes this discretion clear when it allows the IHS to make exceptions to its "unrestricted-license" rule in the first paragraph.  Tr. at 51:13-52:20 (Court)(Langenwalter).  The United States admitted that there was no actual exercise of

discretion in this case, but that the Area Director could delegate the discretion to the personnel credentialing committee if it had been needed.  See Tr. at 52:24-53:6 (Langenwalter).

The Court asked the United States to clarify how it could contend that credentialing falls under the discretionary-function exception if it simultaneously argues that this discretion is not found in paragraph one and was not exercised under paragraph two.  See Tr. at 53:7-54:8 (Court)(Langenwalter).  The United States said that

> the discretion comes from the idea that in order to meet the needs of this facility and provide an emergency room physician to provide services where they would not otherwise be able to provide those services, they need to take into consideration how much a doctor will accept in payment, the availability of housing, board certifications, and other issues, including whether or not they have any restrictions

Tr. at 54:12-21 (Langenwalter).  The discretion, according to the United States, is even clearer in the second paragraph of I.H.M. 3-1.4(C)(5), which begins with the words "in general" and ends by authorizing the Area Director to grant exceptions to the rule on a case-by-case basis.  Tr. at 54:25-55:8 (Langenwalter).  The United States insisted that the courts widely recognize that this discretion continues to hold when operational decisions are delegated down the organizational chart.  See Tr. 55:10-22 (Langenwalter).

The United States closed its rebuttal by addressing the Court's concerns about the availability of remedies for individuals on tribal lands vis-à-vis those not on tribal lands.  See Tr. at 57:3-6 (Langenwalter).  According to the United States, the availability of remedies for American Indians is not the issue before the Court. See Tr. at 57:6-7 (Langenwalter).  The United States insisted that the issue before the Court is whether the United States specifically waived its sovereign immunity for the challenged conduct.  See Tr. at 57:6-10 (Langenwalter).  The United States concedes that what happened to Lydell Begay is unfortunate, but that he has

other remedies and that the United States is right to press its case for immunity, because it (i) has to be accountable to all citizens; and (ii) has to ensure that funds meant for the hospital are not diverted by payment of unwarranted damages.  See Tr. at 57:10-58:17 (Langenwalter).

The United States having concluded its argument, the Begays requested leave of the Court to respond quickly to the United States' rebuttal.  See Tr. at 58:23-59:1 (Cohen).  The Court granted the request.  See Tr. at 59:2 (Court).  Countering the United States' assertion that the I.H.M. is not binding policy, the Begays quoted from I.H.M. 3-1.1(A): "This chapter updates the policy and procedures for the credentialing and clinical privileging of medical staff working in Indian Health Services hospitals."  Tr. at 59:4-12 (Cohen)(quoting I.H.M. 3-1.1(A)).  Such language, according to the Begays, ought to be the coup de grâce for the United States' policy argument, especially given that there is not a hospital in the country "that could be accredited and not have a policy that governs and provides adequate provisions for the credentialing of its physicians."  Tr. at 59:13-60:8 (Cohen).

Turning to respond to the United States' other arguments, the Begays insisted that there is nothing in the I.H.M. credentialing policy that contemplates delegation and that the United States cannot simply render its own policy meaningless by substituting whatever policies it wants in place of set policy directives.  See Tr. at 60:25-61:25 (Cohen).  According to the Begays, the IHS substituted its policy when it allowed someone other than the Area Director to make an exception to the plain language of the I.H.M. credentialing policy.  See Tr. at 62:3-13 (Cohen).  Lastly, the Begays agreed with the United States that the Court should not look at other policy considerations and compensation.  See Tr. at 62:14-17 (Cohen).  The Begays assert, however, that the United States seeks to exculpate itself with respect to credentialing and the conduct of those IHS hires by bringing them on as independent contractors.  See Tr. at 62:17-63:5 (Cohen).

- 26 -

The Court then gave the United States the last word on its Motion.  <u>See</u> Tr. at 63:19-21 (Court).  The United States reiterated that the Motion concerns whether the discretionary-function exception applies, not whether the Begays' negligent credentialing claim has merits. <u>See</u> Tr. at 63:22-64:1 (Langenwalter).  It said that it would bring a separate motion to address the underlying merits of the Begays' claims in the event that the Court determines that the discretionary-function exception does not apply to the negligent credentialing claim or any of the other claims.  <u>See</u> Tr. at 64:1-10 (Langenwalter).

In a bit of housekeeping at the end of the hearing, the Begays and the United States engaged in a quick parry and riposte about the Begays' request for additional discovery.  <u>See</u> Tr. at 65:8-68:8 (Langenwalter)(Cohen)(Court).  The Begays said that they have two pending cases on this matter and that they would prefer, for the sake of efficiency, only to need to take each individual's deposition once.  <u>See</u> Tr. at 66:3-21 (Cohen).  The United States questioned the depositions' relevancy at this time, <u>see</u> Tr. at 68:1-8 (Langenwalter), and asserted the United States has a separate process and various protective orders that would require the depositions for the two cases to be taken separately, <u>see</u> Tr. at 69:17-24 (Langenwalter).

## <u>LAW REGARDING RULE 12(b)(1)</u>

"Federal courts are courts of limited jurisdiction; they are empowered to hear only those cases authorized and defined in the Constitution which have been entrusted to them under a jurisdictional grant by Congress."  <u>Henry v. Office of Thrift Supervision</u>, 43 F.3d 507, 511 (10th Cir. 1994)(Barrett, J.)(citations omitted).  A plaintiff generally bears the burden of demonstrating the court's jurisdiction to hear his or her claims.  <u>See</u> <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 104 (1998)(Scalia, J.)("[T]he party invoking federal jurisdiction bears the burden of establishing its existence.").  Rule 12(b)(1) allows a party to raise the defense of the court's "lack

of jurisdiction over the subject matter" by motion.  Fed. R. Civ. P. 12(b)(1).  The United State

Court of Appeals for the Tenth Circuit has held that motions to dismiss for lack of subject-matter

jurisdiction "generally take one of two forms: (1) a facial attack on the sufficiency of the

complaint's allegations as to subject-matter jurisdiction; or (2) a challenge to the actual facts

upon which subject matter jurisdiction is based."  Ruiz v. McDonnell, 299 F.3d 1173, 1180 (10th

Cir. 2002)(VanBebber, J.).

> On a facial attack, a plaintiff is afforded safeguards similar to those provided in
> opposing a rule 12(b)(6) motion: the court must consider the complaint's
> allegations to be true.  See Ruiz v. McDonnell, 299 F.3d at 1180; Williamson v.
> Tucker, 645 F.2d 404, 412 (5th Cir. 1981).  But when the attack is factual, a
> district court may not presume the truthfulness of the complaint's factual
> allegations.  A court has wide discretion to allow affidavits, other documents, and
> a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule
> 12(b)(1).  In such instances, a court's reference to evidence outside the pleadings
> does not convert the motion to a Rule 56 motion.

Alto Eldorado Partners v. City of Santa Fe, 2009 WL 1312856, at *8-9 (D.N.M. Mar. 11,

2009)(Browning, J.)(citations omitted)).  The United States Court of Appeals for the Fifth Circuit

has stated:

> [T]he trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P.
> 56.  Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction --
> its very power to hear the case -- there is substantial authority that the trial court is
> free to weigh the evidence and satisfy itself as to the existence of its power to hear
> the case.  In short, no presumptive truthfulness attaches to plaintiff's allegations,
> and the existence of disputed material facts will not preclude the trial court from
> evaluating for itself the merits of jurisdictional claims.

Williamson v. Tucker, 645 F.2d 404, 412-13 (5th Cir. 1981)(Randall, J.)(quoting Mortensen v.

First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)).

When making a rule 12(b)(1) motion, a party may go beyond the allegations in the

complaint to challenge the facts upon which jurisdiction depends, and may do so by relying on

affidavits or other evidence properly before the court.  See New Mexicans for Bill Richardson v.

Gonzales, 64 F.3d 1495, 1499 (10th Cir. 1995)(Brorby, J.); Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995)(Baldock, J.).   In those instances where the parties go beyond the pleadings, a court's reference to evidence outside the pleadings does not necessarily convert the motion to a rule 56 motion for summary judgment.  See Holt v. United States, 46 F.3d at 1003 (citing Wheeler v. Hurdman, 825 F.2d 257, 259 n.5 (10th Cir. 1987)(Anderson, J.)).   Where, however, the court determines that jurisdictional issues raised in a rule 12(b)(1) motion are intertwined with the case's merits, the court should resolve the motion either under rule 12(b)(6) or rule 56.   See Franklin Sav. Corp. v. United States, 180 F.3d 1124, 1129 (10th Cir. 1999)(Murphy, J.); Tippett v. United States, 108 F.3d 1194, 1196 (10th Cir. 1997)(Briscoe, J.). "When deciding whether jurisdiction is intertwined with the merits of a particular dispute, 'the underlying issue is whether resolution of the jurisdictional question requires resolution of an aspect of the substantive claim.'"  Davis ex rel. Davis v. United States, 343 F.3d 1282, 1296 (10th Cir. 2003)(Hartz, J.)(quoting Sizova v. Nat'l Inst. of Standards & Tech., 282 F.3d 1320, 1324 (10th Cir. 2002)(Seymour, J.)).

## LAW REGARDING RULE 12(B)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).   "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must: (i) accept as true all well-pleaded factual allegations in the complaint; (ii) view those allegations in the light most favorable to the non-moving party; and (iii) draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322, 127 S.

Ct. 2499, 168 L. Ed. 2d 179 (2007) ("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009) ("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(quoting Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient.  Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))(internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. at 678.  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim for relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. at 677-78 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. at 570). Under Rule 12(b)(6), the Court accepts as true all well-pled factual allegations in the complaint and draws all reasonable inferences from those facts in the Plaintiffs' favor.  See Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006).  "The allegations must be enough that, if assumed to be true, the Plaintiffs plausibly (not just speculatively) ha[ve] a claim for relief."  Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008).

Although affirmative defenses generally must be pled in the defendant's answer, not argued on a motion to dismiss, see Fed. R. Civ. P. 8(c), there are exceptions where: (i) the defendant asserts an immunity defense -- the courts handle these cases differently than other motions to dismiss, see Glover v. Gartman, 899 F. Supp. 2d 1115, 1137-39, 1141 (D.N.M. 2012)(Browning, J.)(citing Pearson v. Callahan, 555 U.S. 223 (2009) and Robbins v. Oklahoma, 519 F.3d 1242 (10th Cir. 2008)); and (ii) where the facts establishing the affirmative defense are apparent on the face of the complaint, see Miller v. Shell Oil Co., 345 F.2d 891, 893 (10th Cir. 1965)(Hill, J.)("Under Rule 12(b), a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim. If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under this rule.").

## LAW REGARDING RULE 56

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must satisfy its burden of production in one of two ways. First, the movant can "introduce evidence into the record that affirmatively disproves an element of the nonmoving party's case." Cardoso v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007)(citing Celotex Corp v. Catrett, 477 U.S. 317, 323 (1986)). Second, the movant can direct the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Cardoso v. Calbone, 490 F.3d at 1197 (quoting Celotex Corp. v. Catrett, 477 U.S. at 323-25). See Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1121 (D.N.M. 2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th

Cir. 1991)).

"If the *moving* party will bear the burden of persuasion at trial, that party must support its

motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would

entitle it to a directed verdict if not controverted at trial." Celotex Corp. v. Catrett, 477 U.S. at

331 (Brennan, J., dissenting)(emphasis in original).[11]   Once the movant meets this burden, rule

56 requires the nonmoving party to designate specific facts showing that there is a genuine issue

for trial. See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 256 (1986).

In a case where the burden of persuasion at trial would be on the nonmovant, the movant

can meet rule 56's burden of production by either (i) providing affirmative evidence negating an

essential element of the nonmovant's claim or (ii) showing the Court that the nonmovant's

evidence is insufficient to demonstrate an essential element of the nonmovant's claim. See

Celotex Corp. v. Catrett, 477 U.S. at 331("If the burden of persuasion at trial would be on the

*nonmoving* party, the party moving for summary judgment may satisfy Rule 56's burden of

production in either . . . submit[ting] affirmative evidence that negates an essential element of the

nonmoving party's claim . . . [or] demonstrat[ing] to the court that the nonmoving party's

evidence is insufficient to establish an essential element of the nonmoving party's claim."

(emphasis in the original)).  Neither the movant nor the nonmovant need submit evidence "in a

form that would be admissible at trial." Celotex Corp. v. Catrett at 324. Rather, the content of

---

[11]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court of the United States, dissented in Celotex Corp. v. Catrett, this sentence is widely understood to be an accurate statement of the law. See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates . . . .)

the evidence presented must be capable of being presented in an admissible form at trial.  See Trevizo v. Adams, 455 F.3d 1155, 1160 (10th Cir. 2006).  For example, parties may submit affidavits to support or oppose a motion for summary judgment, even though the affidavits constitute hearsay, provided that the information can be presented in another, admissible form at trial, such as with live testimony.  See Fed. R. Civ. P. 56(c)(4); Johnson v. Weld Cty., Colo., 594 F.3d 1202, 1209-10 (10th Cir. 2010); Trevizo v. Adams, 455 F.3d at 1160.

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.")(internal quotation marks omitted).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue

to be tried." (citation omitted)(internal quotation marks omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. CIV 07-2123 JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)).   "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment on the mere hope that something will turn up at trial.'"   Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

- 34 -

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue -- whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Anderson v. Liberty Lobby, Inc., 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Fourth, the court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

## LAW REGARDING THE FTCA

As with any jurisdictional issue, the party bringing the suit against the United States bears the burden of proving that Congress has waived sovereign immunity.  See James v. United States, 970 F.2d 750, 753 (10th Cir. 1992).  It is "axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." United States v. Mitchell, 463 U.S. 206, 212 (1983).  "Challenges to jurisdiction can . . . be raised at any time prior to final judgment."  Grupo Dataflux v. Atlas Global Group, L.P., 541 U.S. 567, 571 (2004)(citing Capron v. Van Noorden, 6 U.S. (2 Cranch) 126 (1804)).

The terms of the United States' consent define the parameters of federal-court jurisdiction to entertain suits brought against it.  See United States v. Orleans, 425 U.S. 807, 814 (1976); Ewell v. United States, 776 F.2d 246, 248 (10th Cir. 1985).  When the United States waives its

immunity from suit, a court should neither narrow the waiver nor "take it upon [itself] to extend the waiver beyond that which Congress intended."  Smith v. United States, 507 U.S. at 203 (quoting United States v. Kubrick, 444 U.S. 111, 117-18 (1979)).

In 1948, Congress enacted the FTCA, which waived the United States' sovereign immunity for certain torts that federal employees commit.  See F.D.I.C. v. Meyer, 510 U.S. at 475.  Congress waived sovereign immunity only for certain torts that United States employees cause while acting within the scope of their office or employment.  See 28 U.S.C. § 1346(b).

### 1.    Exhaustion Requirements.

There are certain procedural requirements in suing the United States under the FTCA to which a plaintiff must strictly adhere before a district court can exercise jurisdiction.  The FTCA's jurisdictional statute provides:

> An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.

28 U.S.C. § 2675(a)(emphasis added).  This statute "requires that claims for damages against the government be presented to the appropriate federal agency by filing (1) a written statement sufficiently describing the injury to enable the agency to begin its own investigation, and (2) a sum certain damages claim."  Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d 840, 852 (10th Cir. 2005)(Tymkovich, J.)(quoting Bradley v. United States ex. rel. Veterans Admin., 951 F.2d 268, 270 (10th Cir. 1991)(Anderson, J.)).

"[A] claim should give notice of the underlying facts and circumstances 'rather than the exact grounds upon which plaintiff seeks to hold the government liable.'"  Staggs v. United

States ex rel. Dep't of Health and Human Servs., 425 F.3d 881, 884 (10th Cir. 2005)(McConnell, J.)(quoting Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d at 853).   The Tenth Circuit has added that "the FTCA's notice requirements should not be interpreted inflexibly." Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d at 853.   Whether a plaintiff's administrative claim is sufficient to meet 28 U.S.C. § 2675(a)'s notice requirement is a question of law.  See Staggs v. United States ex rel. Dep't of Health and Human Servs., 425 F.3d at 884.

> ### 2.   **Filing Deadlines.**

The Tenth Circuit recently observed:

> [T]he FTCA has both an administrative-exhaustion requirement, set forth in 28 U.S.C. § 2675(a), and a statute of limitations, set forth in 28 U.S.C. § 2401(b). Combined, these provisions act as chronological bookends to an FTCA claim, marking both a date before which a claim may not be filed and a date after which any filing is untimely.

Barnes v. United States, 776 F.3d 1134, 1139 (10th Cir. 2015)(Holmes, J.).  Once a tort claim accrues against the United States, 28 U.S.C. § 2401 gives a claimant two years to present that claim in writing to the appropriate federal agency.  See 28 U.S.C. § 2401(b)(explaining that claim is "forever barred" unless presented within two years).  After submission of a written claim, the agency usually has six months to reach a final disposition on the claim.  If the agency denies the claim, the claimant has six months to file suit in federal court.  See 28 U.S.C. § 2401(b).

If the agency fails to make a final disposition of the claim within six months, the claimant may "deem[]" that failure a "final denial of the claim," and proceed with his or her suit under the FTCA.  28 U.S.C. § 2675(a).  In the Tenth Circuit, "(at least until there has been a final denial by the relevant agency) there is no limit on when a plaintiff may file a lawsuit predicated on a deemed denial."  Barnes v. United States, 776 F.3d at 1140-41.  An agency may "trigger[] §

2401(b)'s six-month limitations period through final denial of administrative FTCA claims after a 'deemed denial.'" Barnes v. United States, 776 F.3d at 1141.

### 3.    Effect of Failure to Exhaust.

"[A]s a general rule, a premature complaint cannot be cured through amendment, but instead, plaintiff must file a new suit." Duplan v. Harper, 188 F.3d 1195, 1199 (10th Cir. Okla. 1999) (internal quotations omitted). This rule exists because "[a]llowing claimants generally to bring suit under the FTCA before exhausting their administrative remedies and to cure the jurisdictional defect by filing an amended complaint would render the exhaustion requirement meaningless and impose an unnecessary burden on the judicial system." Duplan v. Harper, 188 F.3d at 1199. Courts must dismiss these claims "without regard to concern for judicial efficiency." Ruppert v. Aragon, 448 F. App'x 862, 863 (10th Cir. 2012)(O'Brien, J.)(unpublished). Even the filing of an amended complaint may not serve to cure a prematurely filed original complaint. See Stevens v. United States, 61 F. App'x 625, 627 (10th Cir. 2003)(Baldock, J.)(unpublished).

There is at least one limited exception to the general rule. Duplan v. Harper recognizes an exception where the United States "expressly agreed" to the district court's decision to treat the amended complaint as a new action. 188 F.3d at 1199. See Mires v. United States, 466 F.3d 1208, 1211 (10th Cir. 2006)(McConnell, J.)(finding new action where plaintiff "sought permission to file -- and, with the government's consent and district court's permission, did file -- an amended complaint").

### 4.    Definition of "Sufficient Notice".

Courts define "sufficient notice" based on the facts of each case before them. In Estate of Trentadue ex rel. Aguilar v. United States, the United States contended that the plaintiffs'

administrative claim was insufficient for notice of intentional infliction of emotional distress, because it was based on a theory that prison officials had murdered Trentadue, the inmate, and the allegations did not discuss the specific grounds on which the district court relied in awarding damages, "namely the government's treatment of the Trentadue family in the aftermath of his death and its actions in conducting an autopsy after claiming that no autopsy would be performed without prior approval."  397 F.3d at 852.  The Tenth Circuit disagreed, holding that the "plaintiffs' administrative claim provided notice that [the Department of Justice] should investigate the prison officials' conduct." 397 F.3d at 853.  The Tenth Circuit reasoned that language within the administrative claim "gave DOJ notice of the facts and circumstances surrounding plaintiffs' emotional distress claim and, moreover, is consistent with the plaintiffs' subsequent allegations in their amended complaints."  397 F.3d at 853.

The Tenth Circuit contrasted Estate of Trentadue ex rel. Aguilar v. United States with Dynamic Image Techs., Inc. v. United States, 221 F.3d 34 (1st Cir. 2000)(Selya, J.), where the United States Court of Appeals for the First Circuit held that the plaintiff's administrative claim did not put the agency on notice that it should have investigated the potentially tortious conduct, because the plaintiff's administrative claims were for "misrepresentation, libel, slander, contractual interference, and discrimination," and the amended claims for false arrest arose out of two separate incidences.  221 F.3d at 40.  The First Circuit stated: "Though prolix, that claim did not contain so much as a hint about the alleged false arrest or the incident that spawned it."  221 F.3d at 40.  The First Circuit thus concluded that, "regardless of the labels employed in the amended complaint, that complaint, in substance, seeks recovery based solely on an incident that was not mentioned in the plaintiffs' administrative claim."  221 F.3d at 40 (emphasis omitted).

In Glade ex rel. Lundskow v. United States, a man receiving mental health treatment at a Veterans Administration facility alleged that his therapist worsened his condition by initiating a sexual relationship with him.  See 692 F.3d at 720.  He filed a notice of claim with the VA that "does not mention a failure of anyone to use due care besides the therapist."  Glade v. United States, 692 F.3d 718, 722 (7th Cir. 2012).  The Seventh Circuit, reviewing the notice, commented that "reading the administrative claim you would think the plaintiff was just seeking damages under a theory of respondeat superior against an employer for an employee's battery, and we know that such a theory won't fly under the Tort Claims Act."  692 F.3d at 722.  The plaintiff recognized this problem before filing his complaint and thus asserted a "special relationship" theory of liability instead.  692 F.3d at 723.  The Seventh Circuit affirmed the district court's decision to dismiss the suit, explaining:

> The administrative claim need not set forth a legal theory, but it must allege facts that would clue a legally trained reader to the theory's applicability.  *Palay v. United States,* 349 F.3d 418, 425–26 (7th Cir. 2003); *Murrey v. United States,* 73 F.3d 1448, 1452–53 (7th Cir. 1996).  The plaintiff's claim didn't do that.  The legally trained reader would assume that the plaintiff simply was unaware that the mere fact of a battery by a VA employee would not impose liability on the employer.  We're about to see that the "special relationship" tort theory advanced in the plaintiff's complaint (as distinct from the administrative claim) is outside the bounds of plausibility -- hardly the sort of theory that the VA's legal department should have guessed would be the ground of a lawsuit.

Glade v. United States, 692 F.3d at 722-23.

## 5.    **Medical Cases**.

Some courts have required the claimant to provide extensive information about the injuries alleged in the complaint.  In Staggs v. United States ex rel. Dep't of Health and Human Servs., the Tenth Circuit held that the plaintiff's administrative claim, accusing the hospital of "a substantial departure from the standard of care and . . . negligent management of her pregnancy

and labor," was not sufficient to put the agency on notice that it should have investigated a claim based on lack of informed consent.  425 F.3d at 884.  The Tenth Circuit stated that "[n]othing in Staggs' administrative claims suggests that Staggs consented to a course of treatment or remained on such a course without being informed of her options and risks."  425 F.3d at 884. The Tenth Circuit reasoned that, "given the length and factual specificity of Staggs' description of [the administrative] claim" and the claim's failure to "mention [] consent or a suitable synonym, [the government agency] could have reasonably concluded that a claim of lack of informed consent was not intended and that an investigation into lack of informed consent was unnecessary."  425 F.3d at 885.

Ham v. United States, a similarly restrictive case, involved a prisoner's claims against three dentists who attempted to fix a damaged tooth.  See 2008 WL 818197, at *4.  The plaintiff's administrative claim focused on the first two dentists' alleged errors, mentioning the third dentist only in passing.  The complaint, however, focused on the third dentist's refusal to repair, rather than extract, the tooth.  See 2008 WL 818197, at *4.  Although the court said that the claim "encompasses any cause of action fairly implicit in the facts," it dismissed the complaint, because it "offers the first notice that [the third dentist's] actions were legally objectionable."  2008 WL 818197, at *4.

In Palay v. United States, 349 F.3d 418 (7th Cir. 2003)(Rovner, J.), a prisoner sent a notice of a claim charging the Bureau of Prisons with failing to protect him from violence at the hands of fellow inmates and describing his injuries, but omitting "facts suggesting that the prison medical staff had treated him inappropriately."  349 F.3d at 426.  The prisoner later brought suit on a medical malpractice theory.  The Seventh Circuit held that, although it was a "close[] question," the prisoner failed to provide sufficient notice, because he "did not include facts in his

[notice] from which a legally sophisticated reader might have discerned that he had received inadequate medical treatment." 349 F.3d at 427 (distinguishing this standard from the Fifth Circuit's more liberal standard in Frantz v. United States, 29 F.3d 222, 224-25 (5th Cir. 1994)). See Bethel v. U.S., ex rel. Veterans Admin. Med. Ctr. of Denver, Colorado, 495 F. Supp. 2d at 1124 (holding that plaintiff's treatment-based claim, which focused on medical malpractice, was insufficient notice of subsequent negligent supervision argument).

Other courts have been more generous. In Coffey v. United States, 906 F. Supp. 2d 1114 (D.N.M. 2012)(Browning, J.), the Court determined that a ninety-word claim that alleged that a prisoner's "medical condition was ignored, that he was denied medication, and that he was transferred by the [Bureau of Indian Affairs]" provided sufficient notice of his mother's negligent screening and transfer theories. 906 F. Supp. 2d at 1153-54. The Court found that the claim, despite its brevity, "gave the BIA notice of the facts and circumstances surrounding [plaintiff Coffey's deceased son] Crutcher's medical needs and subsequent death [sufficient] to provide the BIA notice that it should have investigated the underlying conduct." 906 F. Supp. 2d at 1154.

## LAW REGARDING SOVEREIGN IMMUNITY AND THE FTCA

"The United States cannot be sued without its consent." Garcia v. United States, 709 F. Supp. 2d 1133, 1137 (D.N.M. 2010)(Browning, J.). "Congressional consent -- a waiver of the traditional principle of sovereign immunity -- is a prerequisite for federal-court jurisdiction." Garcia v. United States, 709 F. Supp. 2d at 1137-38. "The plaintiff bears the burden of proving that Congress has waived sovereign immunity for all of his claims." Garcia v. United States, 709 F. Supp. 2d at 1138. Accord Bork v. Carroll, 449 F. App'x 719, 721 (10th Cir. 2011)(unpublished)("So it is that a plaintiff seeking to invoke the jurisdiction of the federal

courts bears the burden of identifying an applicable statutory waiver of sovereign immunity when challenged to do so."); Summa v. United States, 936 F.2d 584, 1991 WL 114638, at *3 (10th Cir. 1991)(unpublished table decision)(holding in an FTCA case that the "Plaintiffs bore the burden of proving that the district court had subject matter jurisdiction over their claims" (citing Miller v. United States, 710 F.2d 656, 662 (10th Cir. 1983)).

> **1.      General Principles of Sovereign Immunity**.

It is "axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."  United States v. Mitchell, 463 U.S. 206, 212 (1983)(citations omitted).  Accord FDIC v. Meyer, 510 U.S. 471, 475 (1994); United States v. Testan, 424 U.S. 392, 399 (1976); United States v. Sherwood, 312 U.S. 584, 586 (1941).  As with any jurisdictional issue, the party bringing suit against the United States bears the burden of proving that sovereign immunity has been waived.  See James v. United States, 970 F.2d 750, 753 (10th Cir. 1992).  A waiver of sovereign immunity cannot be implied and must be unequivocally expressed.  See United States v. Nordic Vill., Inc., 503 U.S. 30, 33-34 (1992); United States v. Mitchell, 445 U.S. 535, 538 (1980); United States v. Murdock Mach. & Eng'g Co. of Utah, 81 F.3d 922, 930 (10th Cir. 1996).

> **2.      The FTCA**.

The FTCA waives the United States' sovereign immunity in certain specific tort actions against the United States for money damages.  See Romanach v. United States, 579 F. Supp. 1017, 1019 (D.P.R. 1984)(Laffitte, J.)  Congress has explicitly provided, however, that the only proper party in an action under the FTCA is the United States.  See 28 U.S.C. § 2679(a); Romanach v. United States, 579 F. Supp. at 1018 n.1 (holding that no suit under the FTCA may lie against any agency of the United States eo nomine); Painter v. FBI, 537 F. Supp. 232, 236

(N.D. Ga. 1982)(Forrester, J.)(holding that "[t]he FBI may not be sued eo nomine").

In enacting the FTCA, Congress defined the terms and conditions under which the United

States may be sued in tort.  28 U.S.C. § 1346(b) provides, in pertinent part:

> [T]he district courts . . . shall have exclusive jurisdiction of civil actions on
> claims against the United States, for money damages accruing on and after
> January 1, 1945, for injury or loss of property, or personal injury or death caused
> by the negligent or wrongful act or omission of any employee of the Government
> while acting within the scope of his office or employment, under circumstances
> where the United States, if a private person, would be held liable to the claimant
> in accordance with the law of the place where the act or omission occurred.

A companion FTCA section provides that the United States is liable "in the same manner and to

the same extent as a private individual under like circumstances."  28 U.S.C. § 2674.  "The law

of the place where the alleged negligent conduct took place determines the scope of employment

under the FTCA."  Garcia v. United States, No. 08-0295, 2010 U.S. Dist. LEXIS 71306, 2010

WL 2977611, at *18 (D.N.M. June 15, 2010)(Browning, J.)(citing 28 U.S.C. § 1346(b); Richards

v. United States, 369 U.S. 1, 9 (1962); Williams v. United States, 350 U.S. 857, 857 (1955);

Henderson v. United States, 429 F.2d 588, 590 (10th Cir. 1970)).

The Tenth Circuit has emphasized that all dismissals for lack of jurisdiction, including

those for a failure to establish a waiver of sovereign immunity under the FTCA, should be

without prejudice.  See Mecca v. United States, 389 F. App'x 775, 780 (10th Cir. 2010).  It has

explained: "A longstanding line of cases from this circuit holds that where the district court

dismisses an action for lack of jurisdiction . . . the dismissal must be without prejudice."  Mecca

v. United States, 389 F. App'x at 780 (quoting Brereton v. Bountiful City Corp., 434 F.3d 1213,

1216 (10th Cir. 2006)).  The Tenth Circuit held in Mecca v. United States that the district court

improperly dismissed with prejudice the plaintiff's FTCA claims after it concluded that it lacked

jurisdiction over those claims.  See 389 F. App'x at 780-81 ("Here, because the district court

found itself without jurisdiction over the FTCA claims, dismissal should have been entered without prejudice, even if the court deemed further amendment futile.  We therefore remand with instructions to enter dismissal of these claims without prejudice.").

**3.      Scope of Liability Under the FTCA**.

The FTCA waives the United States' sovereign immunity for certain negligence claims, but it does so only if a private person, performing the same act as the United States, would be liable under the governing state law.  See 28 U.S.C. § 2674 ("The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances . . . .").  "[T]hese sections ensure that the United States is placed in the same position as a private individual by rendering the United States liable for the tortious conduct of its employees if such conduct is actionable in the state in which the United States' action or inaction occurred."  Cortez v. EEOC, 585 F. Supp. 2d 1273, 1284 (D.N.M. 2007)(Browning, J.).  "The FTCA's waiver of sovereign immunity is limited, however." Cortez v. EEOC, 585 F. Supp. 2d at 1284.  "If the claim does not fall within the FTCA's express provisions, or if it falls within one of its exceptions, the claim is not cognizable under the FTCA, and the court must deny relief."  Cortez v. EEOC, 585 F. Supp. 2d at 1284 (citing Williams v. United States, 50 F.3d 299, 304-05 (4th Cir. 1995)).

**a.      Liability Under the Same Circumstances Versus Like Circumstances**.

The Supreme Court has rejected a reading of the FTCA that would impose liability on the United States only "to the same extent as would be imposed on a private individual 'under the same circumstances.'"  Indian Towing Co. v. United States, 350 U.S. 61, 65 (1955)("The Government reads that statute as if it imposed liability to the same extent as would be imposed on a private individual 'under the same circumstances.' But the statutory language is 'under like

circumstances[]' . . . ."). The FTCA did not spur "the creation of new causes of action but acceptance of liability under circumstances that would bring private liability into existence." Feres v. United States, 340 U.S. 135, 141 (1950). It is important for a court to consider the liability of the United States under all the circumstances presented in the case as opposed to selectively considering only a few of the circumstances. See Feres v. United States, 340 U.S. at 141-42. The Supreme Court has illustrated:

> One obvious shortcoming in these claims is that plaintiffs can point to no liability of a 'private individual' even remotely analogous to that which they are asserting against the United States. We know of no American law which ever has permitted a soldier to recover for negligence, against either his superior officers or the Government he is serving. Nor is there any liability 'under like circumstances,' for no private individual has power to conscript or mobilize a private army with such authorities over persons as the Government vests in echelons of command. The nearest parallel, even if we were to treat 'private individual' as including a state, would be the relationship between the states and their militia. But if we indulge plaintiffs the benefit of this comparison, claimants cite us no state, and we know of none, which has permitted members of its militia to maintain tort actions for injuries suffered in the service, and in at least one state the contrary has been held to be the case. It is true that if we consider relevant only a part of the circumstances and ignore the status of both the wronged and the wrongdoer in these cases we find analogous private liability. In the usual civilian doctor and patient relationship, there is of course a liability for malpractice. And a landlord would undoubtedly be held liable if an injury occurred to a tenant as the result of a negligently maintained heating plant. But the liability assumed by the Government here is that created by 'all the circumstances,' not that which a few of the circumstances might create. We find no parallel liability before, and we think no new one has been created by, this Act. Its effect is to waive immunity from recognized causes of action and was not to visit the Government with novel and unprecedented liabilities.

Feres v. United States, 340 U.S. at 141-42 (footnotes omitted).

### b. Considering the Liability Under State Law of Private Actors Versus Governmental Actors.

The United States' liability is coextensive with that of private individuals under the respective States' law, even if comparable government actors would have additional defenses or

additional obligations under that State's law.  See Ewell v. United States, 776 F.2d 246, 248-49 (10th Cir. 1985); Proud v. United States, 723 F.2d 705 (9th Cir. 1984)("But appellants overlook the fact that in enacting the FTCA, Congress -- not the Hawaii Legislature -- determined the tort liability of the United States.  And the FTCA specifically provides that the federal government's tort liability is co-extensive with that of a private individual under state law."); Cox v. United States, 881 F.2d 893, 895 (10th Cir. 1989)(citing Proud v. United States with approval)("This and other courts have applied the same rationale in holding that the United States may invoke the protection of a [private] recreational use statute.").  The Tenth Circuit illustrated some of these same principles in Ewell v. United States:

> The main goal of the FTCA was to waive sovereign immunity so that the federal government could be sued as if it were a private person for ordinary torts. Congress was primarily concerned with allowing a remedy where none had been allowed.  There is no evidence that Congress was concerned with the prospect that immunities created solely for private persons would shield the United States from suit.  The Supreme Court, in United States v. Muniz, 374 U.S. 150 . . . (1963), considered whether it is appropriate to apply immunities created by state law to the United States when it is sued under the FTCA.  The Court was concerned with state laws that immunized prison officials from suits by prisoners and concluded that it is "improper to limit suits by federal prisoners because of restrictive state rules of immunity." 374 U.S. at 164 . . . . The immunity under consideration in that case applied to state, county and municipal prison officials.  Noting its decision in Indian Towing Co. v. United States, 350 U.S. at 65 . . . wherein the Court determined that federal liability had to be determined as if it were a private person and not as if it were a municipal corporation, it concluded that state law immunity applicable to state, county and municipal prison officials would not be applicable to a private person and, therefore, not applicable to the federal government in a suit under the FTCA.

> Thus, while immunities afforded state, county and municipal employees are not applicable to the federal government when sued under the FTCA, immunities created by state law which are available to private persons will immunize the federal government because it is liable only as a private individual under like circumstances.  It is evident, therefore, that the Utah district court was correct in granting the motion for summary judgment.

Ewell v. United States, 776 F.2d at 249.

In a unanimous decision, the Supreme Court recently reversed "a line of Ninth Circuit precedent permitting courts in certain circumstances to base a waiver" under the FTCA "simply upon a finding that local law would make a 'state or municipal entit[y]' liable."  United States v. Olson, 546 U.S. 43, 44 (2005).  As the Supreme Court discussed in United States v. Olson, the United States Court of Appeals for the Ninth Circuit based its decision to find a waiver of liability under the FTCA on two principles:

> In this case, two injured mine workers (and a spouse) have sued the United States claiming that the negligence of federal mine inspectors helped bring about a serious accident at an Arizona mine.  The Federal District Court dismissed the lawsuit in part upon the ground that their allegations were insufficient to show that Arizona law would impose liability upon a private person in similar circumstances.  The Ninth Circuit, in a brief per curiam opinion, reversed this determination. It reasoned from two premises. First, where "'unique governmental functions'" are at issue, the Act waives sovereign immunity if "'a state or municipal entity would be [subject to liability] under the law [. . .] where the activity occurred.'" Second, federal mine inspections being regulatory in nature are such "'unique governmental functions,'" since "there is no private-sector analogue for mine inspections."  The Circuit then held that Arizona law would make "state and municipal entities" liable in the circumstances alleged; hence the FTCA waives the United States' sovereign immunity.

546 U.S. at 45 (alterations in original)(citations omitted).  The Supreme Court "disagree[d] with both of the Ninth Circuit's legal premises." United States v. Olson, 546 U.S. at 45.  Regarding the first premise, the Supreme Court held:

> The first premise is too broad, for it reads into the Act something that is not there. The Act says that it waives sovereign immunity "under circumstances where the United States, if a private person," not "the United States, if a state or municipal entity," would be liable.  Our cases have consistently adhered to this "private person" standard. In *Indian Towing Co. v. United States*, this Court rejected the Government's contention that there was "no liability for negligent performance of 'uniquely governmental functions.'" It held that the Act requires a court to look to the state-law liability of private entities, not to that of public entities, when assessing the Government's liability under the FTCA "in the performance of activities which private persons do not perform." In *Rayonier Inc. v. United States*, the Court rejected a claim that the scope of FTCA liability for "'uniquely

> governmental'" functions depends on whether state law "imposes liability on municipal or other local governments for the negligence of their agents acting in" similar circumstances. And even though both these cases involved Government efforts to escape liability by pointing to the absence of municipal entity liability, we are unaware of any reason for treating differently a plaintiff's effort to base liability solely upon the fact that a State would impose liability upon a municipal (or other state governmental) entity. Indeed, we have found nothing in the Act's context, history, or objectives or in the opinions of this Court suggesting a waiver of sovereign immunity solely upon that basis.

United States v. Olson, 546 U.S. at 45-46 (emphasis in original)(citations omitted).

The Supreme Court rejected the Ninth Circuit's second premise based on the following rationale:

> The Ninth Circuit's second premise rests upon a reading of the Act that is too narrow. The Act makes the United States liable "in the same manner and to the same extent as a private individual under like circumstances." As this Court said in *Indian Towing*, the words "'like circumstances'" do not restrict a court's inquiry to the same circumstances, but require it to look further afield. The Court there considered a claim that the Coast Guard, responsible for operating a lighthouse, had failed "to check" the light's "battery and sun relay system," had failed "to make a proper examination" of outside "connections," had "fail[ed] to check the light" on a regular basis, and had failed to "repair the light or give warning that the light was not operating." These allegations, the Court held, were analogous to allegations of negligence by a private person "who undertakes to warn the public of danger and thereby induces reliance." It is "hornbook tort law," the Court added, that such a person "must perform his 'good Samaritan' task in a careful manner."

United States v. Olson, 546 U.S. at 46 (alterations in original).

The Court has not located any Tenth Circuit decisions that have discussed the related principles enunciated in United States v. Olson. The United States Court of Appeals for the Third Circuit has since held, relying on United States v. Olson, that: "Under the FTCA, the federal government can only be held liable for breaches of duties imposed on private, rather than state, parties." DeJesus v. U.S. Dep't of Veterans Affairs, 479 F.3d 271, 283 n.9 (3d Cir. 2007). The United States Court of Appeals for the Fifth Circuit has held, also relying on United States

v. Olson: "Because the federal government could never be exactly like a private actor, a court's job in applying the standard is to find the most reasonable analogy. Inherent differences between the government and a private person cannot be allowed to disrupt this analysis." In re FEMA Trailer Formaldehyde Prod. Liab. Litig. (Miss. Plaintiffs), 668 F.3d 281, 288 (5th Cir. 2012)(citations omitted).

According to one commentator, courts have generally had little difficulty in finding a comparable factual analogy in the private sector for conduct in which the United States engages: "Although, as indicated above, courts have generally had little difficulty in finding sufficiently analogous private conduct, there have been exceptions, primarily in cases involving 'quasi-legislative' actions, such as administrative rulemaking, and in cases involving law enforcement officials, who, unlike private citizens, are required to make arrests in appropriate situations." 2 L. Jayson & R. Longstreth, Handling Federal Tort Claims § 9.08[1], at 9-219 (2011).  The Tenth Circuit has stated: "It is virtually axiomatic that the FTCA does not apply where the claimed negligence arises out of the failure of the United States to carry out a [federal] statutory duty in the conduct of its own affairs."  United States v. Agronics Inc., 164 F.3d 1343, 1345 (10th Cir. 1999).  It recognized that "[o]ther courts invoke the same rule by the shorthand expressions of immune 'quasi-legislative' or 'quasi-judicial' action."  United States v. Agronics Inc., 164 F.3d at 1345.

Thus, for example, courts have rejected FTCA claims premised upon such administrative/regulatory acts or omissions as (1) the Federal Aviation Administration's failure to take enforcement action against an entity not complying with federal laws and rules; (2) the United States Department of Agriculture's failure to prohibit the exportation of disease-exposed cattle; and (3) various agencies' noncompliance with proper rulemaking procedures.  See United

States v. Agronics Inc., 164 F.3d at 1346 (citations omitted)(finding no FTCA waiver for "the unauthorized division of regulatory jurisdiction between two administrative agencies").

The Court examined the exceptions to the FTCA's waiver of sovereign immunity in Coffey v. United States, 906 F. Supp. 2d 1114 (D.N.M. 2012)(Browning, J.). In that case, a plaintiff brought a wrongful death and negligence action against the Bureau of Indian Affairs based on its decision to contract with a county detention center.  See 906 F. Supp. 2d at 1121. The United States argued against liability on the grounds that the detention center was an independent contractor and that the United States' decision to contract with it fell within the FTCA's discretionary-function exemption.  See 906 F. Supp. 2d at 1121. The Court agreed on both points.  See 906 F. Supp. 2d at 1121.  It explained that the BIA's decision to contract with the detention center was "a matter of the BIA's judgment and choice, which is susceptible to policy analysis," and thus protected under the discretionary function exemption.  906 F. Supp. 2d at 1157.  It added that the United States "is liable under the FTCA for the actions of its employees only," thereby prohibiting liability for the detention center's actions.  906 F. Supp. 2d at 1164.

## LAW REGARDING THE DISCRETIONARY-FUNCTION EXCEPTION

The FTCA also contains several exceptions that preclude the United States' liability.  See 28 U.S.C. § 2680.  One of these exceptions is the discretionary-function exception, which provides that the FTCA shall not apply to claims "based upon the exercise or performance or the failure to exercise or perform a discretionary-function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  The Supreme Court has characterized § 2680(a) as the "boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain

governmental activities from exposure to suit by private individuals." United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808 (1984).

The exception must be strictly construed in the United States' favor. See U.S. Dep't of Energy v. Ohio, 503 U.S. 607, 615 (1992) ("Waivers of immunity must be strictly construed in favor of the sovereign and not enlarged beyond what the language requires.") (internal citations and quotations omitted). Its application is a threshold jurisdictional issue in any case brought under the FTCA. See Johnson v. U.S. Dep't of Interior, 949 F.2d 332, 335 (10th Cir. 1991).

In Berkovitz v. United States, 486 U.S. 531 (1988), the Supreme Court enunciated a two-prong analysis for determining when the FTCA's discretionary-function exception applies. See 486 U.S. at 536; Domme v. United States, 61 F.3d 787, 789-90 (10th Cir. 1995); Black Hills Aviation, Inc. v. United States, 34 F.3d 968, 972-73 (10th Cir. 1994); Kiehn v. United States, 984 F.2d 1100, 1102-1103 (10th Cir. 1993). First, the acts or omissions must be "discretionary in nature, acts that 'involve an element of judgment or choice.'" United States v. Gaubert, 499 U.S. 315, 322 (1991)(quoting Berkovitz v. United States, 486 U.S. at 536). Second, the conduct must be "based on considerations of public policy." United States v. Gaubert, 499 U.S. at 323 (quoting Berkovitz v. United States, 486 U.S. at 537). In applying the Berkovitz v. United States analysis, the question of negligence is irrelevant: "When the government performs a discretionary function, the exception to the FTCA applies regardless of 'whether or not the discretion involved be abused.'" Redman v. United States, 934 F.2d 1151, 1157 (10th Cir. 1991) (quoting 28 U.S.C. 2680(a)).

Conduct is protected under the second prong of Berkovitz v. United States analysis if it was or could have been, "'based on considerations of public policy.'" Kiehn v. United States, 984 F.2d 1103, 1105 (quoting Berkovitz v. United States, 486 U.S. at 537). This principle is a

result of the rule that the second prong requires that the challenged conduct must be, by its nature, "susceptible to policy analysis."  United States v. Gaubert, 499 U.S. at 325. Where agency policy allows an employee to exercise discretion, there is a "strong presumption" that the acts authorized by the policy are grounded in public policy.  United States v. Gaubert, 499 U.S. at 324.  Where a plaintiff alleges a negligent omission, it is "'irrelevant whether the [omission] was a matter of deliberate choice, or a mere oversight.'"  Kiehn v. United States, 984 F.2d at 1105 (internal quotations omitted). "The failure to consider some or all critical aspects of a discretionary judgment does not make that judgment less discretionary and does not make the judgment subject to liability." Kiehn v. United States, 984 F.2d at 1105.

The FTCA's discretionary-function exception protects the challenged conduct if it involves judgment or choice, and is the kind of conduct of a kind that could be based on public policy.  See United States v Gaubert, 499 U.S. at 324-325.  The two-prong test in Berkovitz v. United States applies equally to all government employees, regardless of their rank or position: "[I]t is the nature of the conduct, rather than the status of the actor, that governs whether discretionary function exception applies in a given case."  United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. at 813.  See United States v. Gaubert, 499 U.S. at 325 ("Discretionary conduct is not confined to the policy or planning level."); United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. at 811 ("Where there is room for policy judgment and decision there is discretion.  It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable.")(internal quotations and citation omitted).

Generally, the discretionary-function exception covers law enforcement and investigatory

activities.  See Hobdy v. United States, 968 F.2d 20 (10th Cir. 1998)(Table), 1992 WL 149871, at *2.  For example, in Pooler v. United States, 787 F.2d 868 (3rd Cir.), cert. denied, 479 U.S. 849 (1986), the United States Court of Appeals for the Third Circuit found the discretionary-function exception covered alleged deficiencies in investigative methods that led to the plaintiff's arrest.  See Pooler v. United States, 787 F.2d at 871.  In so doing, the Third Circuit further stated: "Prosecutorial decisions as to whether, when and against whom to initiate prosecution are quintessential examples of governmental discretion in enforcing the criminal law, and, accordingly, courts have uniformly found them to be immune under the discretionary function exception."  Pooler v. United States, 787 F.2d at 871.  This enforcement and investigatory discretion implicates policy factors on how to best achieve the agency's goals and mission under the statutes and regulations it is responsible for administering.  See Kelly v. United States, 924 F.2d 355, 361-362 (1st Cir. 1991)(noting that decisions to investigate are at the core of law-enforcement activity and are protected by the exception); Doherty v. United States, 905 F.Supp.54, 56 (D. Mass. 1995)(explaining that process of deciding how and when to seek a search warrant is grounded in policy considerations).

Certain aspects of an investigation may be considered non-discretionary if officials fail to follow specific agency mandates or directives governing their conduct.  See Couzado v. United States, 883 F. Supp. 691, 694-95 (S.D. Fla. 1995), aff'd in Couzado v. United States, 105 F.3d 1389, 1395-97 (11th Cir. 1997) (affirming Judge Federico A. Moreno's imposition of liability upon the government pursuant to the FTCA, because Customs agent's failure to divulge important information and to cooperate with the DEA in executing the controlled delivery negligently compromised passengers' and the crew's safety and proximately caused the plaintiffs' injuries).

In <u>Ortiz v. United States Border Patrol</u>, 39 F. Supp. 2d 1321 (D.N.M. 1999)(Black, J.), the court noted that, "in the context of activities peculiar to law enforcement, some courts have established exceptions to the principle that the proper comparison in FTCA cases is to private, nongovernment individuals." 39 F. Supp. 2d at 1324. "However, these cases only serve to illustrate that there is a significant difference under the FTCA between 'private persons' and government employees, and that the primary inquiry is how a private person in similar circumstances would be treated under state law." 39 F. Supp. 2d at 1324. The Border Patrol agents in <u>Ortiz v. United States Border Patrol</u> "were not engaged in a function unique to law enforcement when they stopped to render aid at the accident scene." 39 F. Supp. 2d at 1325. "Thus, a private analogue for their actions is readily available," and the Border Patrol was therefore liable for its agents' actions only to the extent that a private person, in the same circumstances, would be liable. 39 F. Supp. 2d at 1325.

## RELEVANT NEW MEXICO LAW REGARDING NEGLIGENCE

Generally, a negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based on a standard of reasonable care, and the breach being a cause-in-fact and proximate cause of the plaintiff's damages. See <u>Herrera v. Quality Pontiac</u>, 2003-NMSC-018, ¶ 6, 73 P.3d 181, 186. "In New Mexico, negligence encompasses the concepts of foreseeability of harm to the person injured and of a duty of care toward that person." <u>Ramirez v. Armstrong</u>, 1983-NMSC-104, ¶ 8, 673 P.2d 822, 825, <u>overruled on other grounds by</u> <u>Folz v. State</u>, 1990-NMSC-075, ¶ 3, 797 P.2d 246, 249. Generally, negligence is a question of fact for the jury. See <u>Schear v. Bd. of Cty. Comm'rs of Bernalillo Cty.</u>, 1984-NMSC-079, ¶ 4, 687 P.2d 728, 729. "A finding of negligence, however, is dependent upon the existence of a duty on the part of the defendant." <u>Schear v. Bd. of Cty. Comm'rs of</u>

Bernalillo Cty., 1984-NMSC-079, ¶ 4, 687 P.2d at 729.  "Whether a duty exists is a question of

law for the courts to decide."  Schear v. Bd. of Cty. Comm'rs of Bernalillo Cty., 1984-NMSC-

079, ¶ 4, 687 P.2d at 729 (citation omitted).  Once courts recognize that a duty exists, that duty

triggers "a legal obligation to conform to a certain standard of conduct to reduce the risk of harm

to an individual or class of persons."  Baxter v. Noce, 1988-NMSC-024, ¶ 11, 752 P.2d 240, 243.

New Mexico courts have stated that foreseeability of a plaintiff alone does not end the inquiry

into whether the defendant owed a duty to the plaintiff.  See Herrera v. Quality Pontiac, 2003-

NMSC-018, ¶ 7, 73 P.3d at 186.  The New Mexico courts have recognized that, "[u]ltimately, a

duty exists only if the obligation of the defendant [is] one to which the law will give recognition

and effect."  Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 9, 73 P.3d at 187 (internal quotation

marks omitted).  To determine whether the defendant's obligation is one to which the law will

give recognition and effect, courts consider legal precedent, statutes, and other principles of law.

See Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 9, 73 P.3d at 186.

       "As a general rule, an individual has no duty to protect another from harm."  Grover v.

Stechel, 2002-NMCA-049, ¶ 11, 45 P.3d 80, 84, 132 N.M. 140, 143. "[C]ertain relationships,

however, that give rise to such a duty [include]: (1) those involving common carriers,

innkeepers, possessors of land; and (2) those who voluntarily or by legal mandate take the

custody of another so as to deprive the other of his normal opportunities for protection."  Grover

v. Stechel, 2002-NMCA-049, ¶ 11, 45 P.3d at 84.  "[W]hen a person has a duty to protect and the

third party's act is foreseeable, 'such an act whether innocent, negligent, intentionally tortious, or

criminal does not prevent the [person who has a duty to protect] from being liable for harm

caused thereby.'"  Reichert v. Atler, 1994-NMSC-056, ¶ 11, 117 N.M. 623, 626, 875 P.2d 379,

382.

"[T]he responsibility for determining whether the defendant has breached a duty owed to the plaintiff entails a determination of what a reasonably prudent person would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all the surrounding circumstances." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 33, 73 P.3d at 194. "The finder of fact must determine whether Defendant breached the duty of ordinary care by considering what a reasonably prudent individual would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all surrounding circumstances of the present case . . . ." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 33, 73 P.3d at 195.

"A proximate cause of an injury is that which in a natural and continuous sequence [unbroken by an independent intervening cause] produces the injury, and without which the injury would not have occurred." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195. "It need not be the only cause, nor the last nor nearest cause." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195. "It is sufficient if it occurs with some other cause acting at the same time, which in combination with it, causes the injury." Herrera v. Quality Pontiac, 2003-NMSC-018, ¶ 34, 73 P.3d at 195.

## ANALYSIS

The Court first grants the United States' Motion to dismiss Count II, which alleges negligent supervision. The Court is convinced that IHS supervision of Dr. Marrocco preserved an element of judgment and implicated public policy concerns, thereby qualifying it as discretionary conduct for FTCA purposes. Accordingly, the United States has not waived sovereign immunity over supervisory decisions, and the Court thus lacks subject-matter jurisdiction to judge Count II on its merits.

The Court then denies the United States' Motion to dismiss Count III, which alleges negligent hiring/credentialing.  The Court holds that the I.H.M. required IHS to follow a specific procedure when hiring and credentialing Dr. Marrocco, and that this procedure did not implicate public policy considerations that Congress sought to shield through the FTCA.  Accordingly, the United States waived its sovereign immunity over the hiring and credentialing decisions, and the Court has subject-matter jurisdiction to judge Count III on its merits.

Last, the Court denies the Begays' request for additional discovery.  The Begays wish to depose all individuals involved in hiring Dr. Marrocco.  The Court holds, however, that this additional discovery is not necessary for a determination of jurisdiction at this time.

## I.    THE COURT DISMISSES COUNT II -- NEGLIGENT SUPERVISION -- FOR LACK OF JURISDICTION.

For challenged conduct to fall within the FTCA's discretionary-function exception, it must satisfy two different criteria.  First, it must retain an element of judgment or choice rather than follow a specifically mandated operating procedure.  Second, it must implicate public policy decisions that Congress sought to shield from judicial second-guessing.  See Berkovitz v. United States, 486 U.S. at 536.

IHS supervision of Dr. Marrocco satisfies the first of these two criteria.  The I.H.M. mandated the timing of Dr. Marrocco's employment review -- "near or at the end of this 1-year probationary period."  I.H.M. 3-1.4(E).  Nevertheless, neither the I.H.M. nor any other document spells out a protocol, benchmarks, criteria, or algorithms for the review.  By default, this necessarily left Dr. Marrocco's supervisors with an element of discretion when deciding how to assess her work product.

IHS supervision of Dr. Marrocco likewise satisfied the second of the two <u>Berkovitz v.</u> <u>United States</u> criteria.  IHS has a mission to raise the physical, mental, social, and spiritual health of American Indians to the highest possible level.  <u>See</u> Motion at 11.[12]  Yet IHS regularly finds it difficult to retain physicians to serve in the Navajo Area.  <u>See</u> Catherine Kim, <u>Recruitment and</u> <u>Retention in the Navajo Area Indian Health Service</u>, 2000 West J. Med. 173, 240-43.  IHS' local procurement officials thus must weigh a variety of financial, social, organizational, and logistic considerations when deciding which of its probationary physicians to retain.

During the motion hearing, the Begays conceded that Count II presents their weakest case for the non-applicability of the discretionary-function exception.  <u>See</u> Tr. at 19:3-20 (Cohen). After evaluating the facts of the case in the light of the two-prong <u>Berkovitz v. United States</u> test for discretionary conduct, the Court agrees that Count II is not robust.  The Begays do not meet their burden of proving that Congress has waived sovereign immunity for IHS supervision, as the Tenth Circuit requires for the requested relief.  <u>See</u> <u>James v. United States</u>, 970 F.2d at 753. Because the Court must strictly construe the discretionary-function exception in the United States' favor, <u>see</u> <u>United States Dep't of Energy v. Ohio</u>, 503 U.S. at 615, the Court holds that IHS supervisor conduct vis-à-vis Dr. Marrocco was discretionary.  Because the supervisory conduct was discretionary and thus is exempt from liability under the FTCA, the United States retains its sovereign immunity on Count II, and the Court, lacking subject-matter jurisdiction, dismisses Count II.

---

[12] <u>See</u> Indian Health Service, Agency Overview, https://www.ihs.gov/aboutihs/overview/ ("Our Mission… to raise the physical, mental, social, and spiritual health of American Indians to the highest level.")(ellipses used stylistically in the original).

## II.    THE COURT HAS JURISDICTION OVER COUNT III -- NEGLIGENT HIRING/CREDENTIALING -- AND DENIES THE UNITED STATES' MOTION TO DISMISS COUNT III.

IHS faced a decision whether to hire and credential Dr. Marrocco as an independent contractor to work at the North Navajo Medical Center in 2012.  Just as is true regarding its supervisory conduct, IHS could turn to one section of the I.H.M. for a policy about how to make these hiring and credentialing decisions.  That section reads as follows:

> Members of the medical staff and others who must apply for clinical privileges must hold an active and unrestricted State license, certification, or registration, as applicable, to practice in their professional field.  The term "unrestricted" means that there are no restrictions, special considerations, periods of monitoring, or probationary requirements associated with license, certification, or registration that restricts or inhibits the ability of the practitioner to practice his/her profession in the specialty or clinical area for which the practitioner is being hired.  This includes any stipulations that may have a potentially significant adverse impact on patients, the medical staff, or the efficiency of the facility.

> In general, providers with any restrictions on any State license, certification, or registration will not be granted medical staff membership or clinical privileges.  However, exceptions may be granted on a case-by-case basis by the Area Director.

I.H.M. 3-1.4(C)(5).  IHS was not subject to any other statutes, regulations, or policies when making its hiring and credentialing decisions.

Unlike the I.H.M. provision governing supervision of medical staff, I.H.M. 3-1.4(C)(5) does not leave those making hiring and credentialing decisions with an element of choice or judgment. If a physician-applicant has a restricted license, then he or she is not to be hired without an exception from the Area Director.  No language in the policy allows deviations from this protocol, or for the Area Director to delegate his or her authority to make exceptions to the rule to the hiring committee.

- 60 -

Unlike the I.H.M. provision governing supervision of medical staff, I.H.M. 3-1.4(C)(5) also does not implicate public policy at the individual hiring level.  Budgetary, social, and other policy decisions certainly are salient when an agency is seeking out a service provider such as Medicus Healthcare, through which it will hire its independent contractors.  Under I.H.M. 3-1.4(C)(5), the decision whether to hire and credential one physician-applicant with license problems over another, however, is more akin to an administrative task.

Many district courts in all corners of the country have come to the conclusion that a physician hired as an independent contractor falls within the scope of the discretionary-function exception. The United States District Court for the Western District of Virginia has held that the exception covers the decision of the United States Veterans Administration ("VA") to hire an orthopedic surgeon under an independent contract.  See Blankenship v. United States, 111 F. Supp. 3d 745, 750 (W.D. Va. 2015)(Conrad, J.)(saying that the VA's "decision to hire an independent contractor to render services for the United States is precisely the type of decision that the exception is designed to shield from liability because it involves exercising judgment based on considerations of policy").  The United States District Court for the Northern District of California came to the same conclusion in another case of an independent contractor physician at the VA. See Meier v. United States, 2006 U.S. Dist. LEXIS 93138, at *10-11 (N.D. Cal. Dec. 22, 2006)(Alsup, J.).  The United States District Court for the Southern District of New York concluded that the discretionary-function exception covered the allegedly negligent hiring of a primary physician working under an independent contract.  See Gibbons v. United States, 533 F. Supp 2d 449, 456 (S.D.N.Y. 2008)(Cedarbaum, J.).  The United States District Court for the Southern District of Ohio came to the same conclusion about an independent contractor physician working for the United States Department of Defense when the physician failed to

properly diagnose a wrist fracture.  See Moser v. United States, 2006 U.S. Dist. LEXIS 33374, at *20 (S.D. Ohio 2006)(Dlott, J.).   The United States District Court for the District of Nevada found that the discretionary-function exception covered the allegedly negligent hiring of medical staff at a federal prison.  See Botha v. United States, 2014 U.S. Dist. LEXIS 126846, at *7 (D. Nev. Sept. 2, 2014)(Leen, J.).   The Court agrees with these courts.  Not all, most, or generic hiring and credential decisions can be brought against the United States.  As a rule, plaintiffs cannot generally challenge hiring and credentialing decisions, because they are discretionary. Here, however, the Begays have managed to state a very narrow claim based on one section of the I.H.M.:  that narrow claim survives; all other hiring and credentialing issues are dismissed for lack of jurisdiction.

Just as the Court may not narrow the United States' waiver of sovereign immunity, it may not expand this waiver to encompass conduct that Congress did not intend to shield.  See Smith v. United States, 507 U.S. at 203.  After evaluating the case's facts in the light of the two-prong Berkovitz v. United States test for discretionary conduct, the Court holds that the discretionary-function exception does not apply to IHS conduct hiring and credentialing Dr. Marrocco, under I.H.M. 3-1.4(C)(5).  All other credentialing and hiring claims are  dismissed.  Because the exception does not apply, to that narrow claim, the United States does not enjoy sovereign immunity on Count III relying solely on I.H.M. 3-1.4(C)(5).   Retaining subject-matter jurisdiction over Count III, the Court denies the United States' motion to dismiss that part of Count III.  Any other hiring and credentialing claims are dismissed.

**III.    THE COURT DENIES THE BEGAYS' REQUEST FOR ADDITIONAL DISCOVERY BEFORE IT RULES ON THE JURISDICTION MOTION.**

In the Begay's Response to the Motion, the Begays request permission from the Court to take additional discovery consisting of depositions of all the individuals identified in United States' Response to Plaintiff's First Set of Interrogatories and Request for Production, filed March 15, 2016 (Doc. 58-1)("Interrogatories"), before the Court rules on the Motion.[13]   The

---

[13]That Interrogatory asks: "For each person involved in the hiring of Annicol Marrocco, M.D. at the Northern Navajo Medical Center, please provide that person's name and title, and describe his/her role in the hiring process."  Interrogatories at 3.  The United States responded:

The United States objects to Interrogatory No. 1 on the grounds that the use of the terms "hiring" and "hiring process" are vague and ambiguous since Dr. Annicol Marrocco was an independent contractor.  Nothing in this response is intended to concede that an employer/employee relationship existed.

Subject to and without waiving its objection the United States responds that Dr. Annicol Marrocco was an employee of Medicus Health Care Solutions, LLC.  The following individuals were involved in the place and confirmation of credentials of Dr. Marrocco at NNMC:

Bridget McAdams
Government Coordinator
Medicus Health Care Solutions, LLC
7 Industrial Way, Suite 5
Salem, NH 03079

Ms. McAdams served as Coordinator for Government placement and a point of contact for credentialing of Dr. Marrocco.

Courtney Gould
Manager,
Medicus Health Care Solutions, LLC
7 Industrial Way, Suite 5
Salem, NH 03079

Ms. Gould served as a contact person for Ms. McAdams, and as such provided the materials and information required by NNMC to complete the credentialing process for Dr. Marrocco.

Court concludes that the requested additional discovery is not essential for the Court to

determine its jurisdiction at this time and so denies this discovery takes place.  The Begays may

_____

Thomas B. Burnison, MD
Chief Emergency Medicine (Past)
Northern Navajo Medical Center
Shiprock, NM

Dr. Burnison reviewed Dr. Marrocco's credentials and curriculum vitae and contacted references to confirm Dr. Marrocco was suitable for selection as an independent contractor ER doctor at NNMC.

Pamela Harrison
Credentialing Specialist
Northern Navajo Medical Center
Shiprock, NM

Pamela Harrison coordinated collection of materials, information, references, and licensure for Dr. Marrocco as part of the credentialing process at NNMC.

Fanessa Comer, CEO
Beverly Newood-Tolbertson, Medical Staff Coordinator
Dr. George Baacke, Family Medicine
Dr. John Mohs, Family Medicine
Northern Navajo Medical Center
Shiprock, NM

Ms. Comer and Ms. Newood-Tolbertson and Drs. Baacke and Mohs were kept apprised of the contracting and credentialing process for Dr. Marrocco as indicate in the emails produced in response to Plaintiff's Request for Production.

Therese Hickey
Office of General Counsel,
Dept. Of Health And Human Services

Ms. Hickey provided legal counsel to Dr. Burnison and Ms. Harrison regarding the interpretation and application of the Consent Agreement and Order, Commonwealth of Pennsylvania, dated October 15, 2012 Order approving Consent Agreement, State Board of Medicine, Commonwealth of Pennsylvania, dated December 5, 2012 as it pertained to Dr. Marrocco's license in that state.

Interrogatories at 3-4.

certainly take their discovery if they want, and if discovery turns up evidence that calls into question anything that the Court has said, they can ask the Court to reconsider its jurisdiction ruling.  On the present record, however, the Court concludes that it has a firm basis for its jurisdictional rulings.

**IT IS ORDERED** that the United States' Rule 12(b)(1) Motion to Dismiss Counts II and III for Lack of Subject Matter Jurisdiction under the Federal Torts Claim Act, 28 U.S.C. § 2671 ("FTCA"), filed February 3, 2016 (Doc. 52)("Motion"), is granted in part and denied in part. Count II of the First Amended Complaint for Damages, filed October 30, 2015 (Doc. 32) is dismissed without prejudice.  The narrow hiring and credentialing claim under I.H.M. 3-1.4(C)(5) stated in the Complaint remains, but all other hiring and credentialing claims are dismissed without prejudice.  All other requests including in the Plaintiff's Response to United States of America's Rule 12(b)(1) Motion to Dismiss Counts II and III for Lack of Subject Matter Jurisdiction, filed March 14, 2016 (Doc. 57), are denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Seth T. Cohen
Cynthia Zedalis
Cohen & Zedalis LLP
Santa Fe, New Mexico

-- and --

- 65 -

Turner W. Branch
Margaret Moses Branch
Branch Law Firm
Albuquerque, New Mexico

*Attorneys for the Plaintiffs*

Damon P. Martinez
  United States Attorney
Erin Langenwalter
  Assistant United States Attorney
Albuquerque, New Mexico

*Attorneys for the Defendant*