# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

LYDELL MARVIN BEGAY,
MARTIN ("MARTY") BEGAY, and
LORENE BEGAY,

       Plaintiffs,

vs.                                             No. CIV 15-0358 JB/SCY

UNITED STATES OF AMERICA,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Motion to Quash Plaintiffs' Subpoena, filed March 30, 2017 (Doc. 110)("Motion"). The Court held a hearing on May 8, 2017. The primary issue is whether the Plaintiffs' subpoena of Lance Leider, an attorney who represented Doctor Annicol Marrocco during a Drug Enforcement Agency ("DEA") investigation, seeks records that Marrocco's attorney-client privilege protects from disclosure. The Court concludes that the Plaintiffs' subpoena seeks "nonprivileged matter that is relevant to [the Plaintiffs' claims] and proportional to the needs of the case," so it denies the Motion. Fed. R. Civ. P. 26(b)(1).

## FACTUAL BACKGROUND

On March 2014, Plaintiff Lydell Marvin Begay visited the emergency room at the Northern Navajo Medical Center in Shiprock, New Mexico. See Complaint for Damages ¶ 2, at 1-2, filed April 28, 2015 (Doc. 1)("Complaint"). According to the Plaintiffs, "[a]s a result of Defendant's negligent medical care, misdiagnosis and failure to adequately credential, staff, or supervise the emergency room at NNMC, Lydell Begay suffered catastrophic and permanent injuries, injuries that have all but taken this young man's life away." Complaint ¶ 4, at 2. Also

according to the Plaintiffs, "the physician who treated Lydell Begay, Annicol Marrocco, M.D., was acting under restricted medical licenses and required close supervision," but "NNMC provided no such supervision." Complaint ¶ 3, at 2. The Plaintiffs assert that, when Marrocco treated Begay, "she was not licensed to practice medicine in the State of New Mexico and instead was acting under restricted licenses issued by the States of Florida, New York, and Pennsylvania," and has "been censured and fined by the New York and Pennsylvania Medical Boards." Complaint ¶¶ 18, 20, at 5-6.

**PROCEDURAL BACKGROUND**

On April 27, 2015, the Plaintiffs filed their Complaint. <u>See</u> Complaint at 13. The Complaint does not name Marrocco as a Defendant. It instead -- pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2672, ("FTCA") -- names only Defendant United States of America. <u>See</u> Complaint ¶ 6, at 3.

**1. The Motion.**

Marrocco filed the Motion on March 30, 2017. <u>See</u> Motion at 3. According to Marrocco, "Leiter, an attorney practicing in Orlando, Florida, was Dr. Marrocco's personal attorney whom she retained to represent her when the DEA initiated an investigation into her history of prescription writing in May of 2013," and, also according to Marrocco, "[f]ollowing a hearing, the DEA concluded its investigation into Dr. Marrocco on May 4, 2015." Motion ¶ 2, at 1-2. Marrocco asserts, "[u]pon information and belief," that the Plaintiffs' subpoena to Leiter "seeks all documents and correspondence relating to" those proceedings, and adds that "[a] copy of the Subpoena is not attached because a copy of the subpoena was not forwarded to Dr. Marrocco's counsel." Motion ¶ 2, at 1-2. Marrocco argues that her attorney-client privilege protects the contents of Leiter's file regarding her case and, to the extent that the file contains non-privileged

material, "those records are a matter of public record equally available to plaintiffs." Motion ¶ 4, at 2-3. Marrocco also argues that the subpoena subjects Leiter to an undue burden. <u>See</u> Motion ¶¶ 5-7, at 3-4. Marrocco concludes that, because "a subpoena shall be quashed or modified if it requires disclosure of privileged or other protected matter," and because "a subpoena <u>must</u> be quashed if it subjects a person, especially a non-party, to undue burden," the Court should quash the Plaintiffs' subpoena. Motion ¶¶ 3, 5, at 2-3 (emphasis the original)(citing Fed. R. Civ. P. 45(d)(3)(A)).

      **2.**     **<u>The Response</u>.**

The Plaintiffs argue, first, that Marrocco spells her own lawyer's name incorrectly. <u>See</u> Plaintiffs' Response to Motion to Quash Plaintiffs' Subpoena at 1 n.1, filed April 12, 2017 (Doc. 113)("Response")("Mr. Leider's name is correctly spelled in the subject subpoena. *See* www.thehealthlawfirm.com."). More importantly, the Plaintiffs argue that their subpoena does not request Leider to produce privileged documents, because their subpoena requests only the "non-privileged documents in Mr. Leider's possession relating to proceedings before the [DEA] concerning Dr. Marrocco." Reponse at 1. The Plaintiffs contend that they "are entitled to fully explore the extent, nature and type of evidence and testimony submitted on Dr. Marrocco's behalf to the DEA," because "[s]uch information either was known or should have been known to the Northern Navajo Medical Center . . . when they granted full, active medical privileges to Dr. Marrocco before she treated Plaintiff Lydell Begay." Response at 2. The Plaintiffs contend that "this information is not publicly or otherwise available," and that they "have attempted to obtain the same information covered by the subpoena from Dr. Marrocco herself, but to no avail." Response at 2. The Plaintiffs further contend that, "the subpoena is limited as to time (*i.e.,* 2013-2015), thereby avoiding the imposition of any undue burden on Mr. Leider." It

follows, according to the Plaintiffs, that the Court should deny the Motion.  Response at 5.

### 3.    The Reply.

Marrocco admits that the Plaintiffs' subpoena asks for only documents that are not privileged, and she explains that she did not possess a copy of the subpoena when she drafted the Motion, which "object[s], upon information and belief, that the Subpoena likely sought privileged communications."  Reply in Support of Motion to Quash Plaintiffs' Subpoena at 1, filed April 27, 2017 (Doc. 115)("Reply").  Marrocco argues that complying with the subpoena would require both Leider and Marrocco to "be involved in the potentially burdensome and time consuming process of reviewing *all* communications in the file to determine those that are privileged," and notes that "there are likely to be references to the third-party patient whose care was at issue [in the DEA proceeding,] and such references would have to be carefully redacted to ensure that his privacy and confidential health information were protected."  Reply at 2. Marrocco also argues that the subpoena is overbroad insofar as "[t]he medical treatment at issue [in this case] took place in March 2014," while the subpoena "seeks records through May 2015." Reply at 2.  Finally, Marrocco argues:

> [A]ny information in Mr. Leider's file that pre-dates March 2014 is only relevant if NNMC should have, in the exercise of reasonable diligence, obtained that information.  Plaintiffs, however, provide no evidence or testimony that would suggest NNMC could have accessed Mr. Leider's file, at any time, to discover the information that Plaintiffs now seek.

Reply at 3.  Marrocco accordingly concludes that the Court should either quash the Plaintiffs' subpoena to Leider or, alternatively, "conduct an in camera review of any documents."  Reply at 3.

### 4.    The Hearing.

The Court held a hearing on May 8, 2017, and lawyers appeared for "the Begays," Tr. at

2:7-8 (Zedalis), for the United States, <u>see</u> Tr. at 2:12-13 (Jeu), and for Marrocco, <u>see</u> Tr. at 2:16-17 (Schofield).  The Court began the hearing by articulating its initial impression:

> Well, I'll certainly hear what anybody wants to say on this, but I guess my thoughts are, that unless I don't understand the circumstances it looks like it's a valid subpoena to Lance Lieder.  There are some documents that are in his file that would be relevant to this case that would not be privileged.  It seems to me that it's not his entire office's file.  It's just this file involving Mr. Lieder doing work for Dr. Marrocco, and it seems to me probably the material that's going to fall within the scope of the subpoena is rather than [segregated].
>
> There still may be some materials that are privileged.  But from it seems like a privilege log would be appropriate.  It seems to me it's narrow so I guess I'm inclined not to the grant the motion to quash, but require the plaintiff or require the Mr. Lieder to prepare some privilege log.  I'll leave it to Dr. Marrocco and Mr. Lieder to figure out who is going to pay for that.  But it doesn't seem to me that it's probably a big burden to produce what the plaintiffs are requesting. So those are my thoughts.

Tr. at 2:20-3:15 (Court).  Marrocco noted that, in addition to privileged material, "throughout the file there is also reference to the patient who was at issue," and asked for permission to redact the patient's name.  Tr. at 3:25-4:3 (Schofield).  The Plaintiffs indicated that they did not object to such a redaction.  <u>See</u> Tr. at 4:4-6 (Court, Zedalis).  Marrocco then noted that, "after the briefing was completed," she spoke to Lieder regarding her file, and, "[a]lthough they're stored electronically, so it's a little hard to gauge, he estimated it to be about two banker's boxes full of documents."  Tr. at 4:8-14 (Schofield).

Marrocco then raised two additional issues.  <u>See</u> Tr. at 4:14-5:10, 6:4-11 (Court, Schofield).  First, Marrocco asked the Court to order the Plaintiffs to pay for the costs associated with reviewing Leider's file, because "Dr. Marrocco is not a party to this, but simply a witness." Tr. at 4:14-20 (Schofield).  Second, Marrocco argued that "anything that was after the treatment of Mr. Begay, which is from March 2014 going forward," is not relevant to the Plaintiffs' case, because it is "information Northern Navajo could not have obtained, because it happened after

the treatment in question."  Tr. at 6:4-11 (Schofield).  The United States agreed on the latter

point.  <u>See</u> Tr. at 6:21-23 (Jeu)("I agree that the time period after March 2014 is really irrelevant

to what's going on here.").

The Plaintiffs then indicated that "[w]e're not going to agree to cut off the time to 2015,"

because "the DEA order that came down . . . in May of 2015 . . . reflects [Marrocco's] testimony

and documents that predate her evaluation of Mr. Begay in March 2014," so, according to the

Plaintiffs, "there may very well be documents relevant to the time period in question that are

reflected in post 2015 correspondence, affidavits, reports, whatever that is in the DEA file."  Tr.

at 7:10-8:6 (Zedalis).  As to shifting the costs associated with producing Leider's file, the

Plaintiffs argued that, absent Court intervention, "insurance is paying for all these" costs, and

that the Court should not shift those costs to the Plaintiffs, because

> [t]he Begays are a family of limited means.  They don't have running water.
> They live in Fruitland, New Mexico on a plot of land that Ms. Begay inherited
> from her family.  They don't have a structure on their property.  To ask them to
> pay for the attorneys' fees . . . is just, it's I think it's uncalled for, Your Honor . . .
> .

Tr. at 8:20-9:4 (Zedalis).

The Court concluded:

> Well, I do think that it's hard to come up with any sort of deadlines.  I mean, I
> agree [with the Plaintiffs] that sometimes documents that may come in or exist
> after March 2014 may show events before that, so I think it's hard to come up
> with a deadline that's very useful that's going to keep Dr. Marrocco and Mr.
> Lieder from looking at every document.  So they might as well be produced.  So
> I'm not going to set any deadline.  I'm not going to shift costs here.  This seems to
> be just a manageable amount of discovery.  Dr. Marrocco may end up having to
> pay for it.  But given her involvement in this case, it seems to me that the costs
> shouldn't be shifted.

Tr. at 9:13-25 (Court).

## LAW REGARDING DISCOVERY

Rule 34 governs discovery requests for tangible objects and states:

A party may serve on any other party a request within the scope of Rule 26(b):

> **(1)** to produce and permit the requesting party or its representative to inspect, copy, test, or sample the following items in the responding party's possession, custody, or control:
>
>> **(A)** any designated documents or electronically stored information -- including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations -- stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form; or
>>
>> **(B)** any designated tangible things; or
>
> **(2)** to permit entry onto designated land or other property possessed or controlled by the responding party, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

Fed. R. Civ. P. 34(a). Discovery's proper scope is "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case. . . ." Fed. R. Civ. P. 26(b)(1). The factors that bear upon proportionality are: "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

Discovery's scope under rule 26 is broad. See Gomez v. Martin Marietta Corp., 50 F.3d 1511, 1520 (10th Cir. 1995); Sanchez v. Matta, 229 F.R.D. 649, 654 (D.N.M. 2004)(Browning, J.)("The federal courts have held that the scope of discovery should be broadly and liberally

construed to achieve the full disclosure of all potentially relevant information.").  The federal discovery rules reflect the courts' and Congress' recognition that "mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation."  Hickman v. Taylor, 329 U.S. 495, 507 (1947).  A district court is not, however, "required to permit plaintiff to engage in a 'fishing expedition' in the hope of supporting his claim."  McGee v. Hayes, 43 F. App'x 214, 217 (10th Cir. 2002)(unpublished).  "'Discovery . . . is not intended to be a fishing expedition, but rather is meant to allow the parties to flesh out allegations for which they initially have at least a modicum of objective support.'"  Rivera v. DJO, LLC, No. 11-1119, 2012 WL 3860744, at *1 (D.N.M. August 27, 2012)(Browning, J.)(quoting Tottenham v. Trans World Gaming Corp., No. 00-7697, 2002 WL 1967023, at *2 (S.D.N.Y. 2002)(Knapp, J.)).  "[B]road discovery is not without limits and the trial court is given wide discretion in balancing the needs and rights of both plaintiff and defendant."  Gomez v. Martin Marietta Corp., 50 F.3d at 1520 (internal quotation marks omitted).

The 2000 amendments to rule 26(b)(1) began narrowing the substantive scope of discovery and injected courts deeper into the discovery process.  See Simon v. Taylor, No. 12-0096, 2015 WL 2225653, at *23 (D.N.M. April 30, 2015)(Browning, J.).  Before the 2000 amendments, rule 26(b)(1) defined the scope of discovery as follows:

> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending actions, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1)(1996).  The 2000 amendments made the following changes, shown here

with the deleted language stricken and the added material underlined:

> Parties may obtain discovery regarding any matter, not privileged, that ~~which is relevant to the subject matter involved in the pending actions, whether it relates to~~ the claim or defense of ~~the party seeking discovery or to the claim or defense of~~ any ~~other~~ party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. <u>For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.</u>  Relevant ~~The~~ information ~~sought~~ need not be admissible at the trial if discovery the ~~information sought~~ appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1).  Putting aside the last sentence's changes -- which the advisory committee's notes make clear was a housekeeping amendment to clarify that inadmissible evidence must still be relevant to be discoverable -- the 2000 amendments have two effects: (i) they narrow the substantive scope of discovery in the first sentence; and (ii) they inject courts into the process in the entirely new second sentence.

> In 1978, the Committee published for comment a proposed amendment, suggested by the Section of Litigation of the American Bar Association, to refine the scope of discovery by deleting the "subject matter" language.  This proposal was withdrawn, and the Committee has since then made other changes in the discovery rules to address concerns about overbroad discovery.  Concerns about costs and delay of discovery have persisted nonetheless, and other bar groups have repeatedly renewed similar proposals for amendment to this subdivision to delete the "subject matter" language.  Nearly one-third of the lawyers surveyed in 1997 by the Federal Judicial Center endorsed narrowing the scope of discovery as a means of reducing litigation expense without interfering with fair case resolutions.  [Federal Judicial Center, T. Willging, J. Shapard, D. Stienstra, & D. Miletich, Discovery and Disclosure Practice, Problems, and Proposals for Change] 44–45 (1997).  The Committee has heard that in some instances, particularly cases involving large quantities of discovery, parties seek to justify discovery requests that sweep far beyond the claims and defenses of the parties on the ground that they nevertheless have a bearing on the "subject matter" involved in the action.

> The amendments proposed for subdivision (b)(1) include one element of these earlier proposals but also differ from these proposals in significant ways. The similarity is that the amendments describe the scope of party-controlled discovery in terms of matter relevant to the claim or defense of any party.  The

court, however, retains authority to order discovery of any matter relevant to the subject matter involved in the action for good cause. The amendment is designed to involve the court more actively in regulating the breadth of sweeping or contentious discovery. The Committee has been informed repeatedly by lawyers that involvement of the court in managing discovery is an important method of controlling problems of inappropriately broad discovery. Increasing the availability of judicial officers to resolve discovery disputes and increasing court management of discovery were both strongly endorsed by the attorneys surveyed by the Federal Judicial Center. *See Discovery and Disclosure Practice*, supra, at 44. Under the amended provisions, if there is an objection that discovery goes beyond material relevant to the parties' claims or defenses, the court would become involved to determine whether the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action. The good-cause standard warranting broader discovery is meant to be flexible.

**The Committee intends that the parties and the court focus on the actual claims and defenses involved in the action. The dividing line between information relevant to the claims and defenses and that relevant only to the subject matter of the action cannot be defined with precision. A variety of types of information not directly pertinent to the incident in suit could be relevant to the claims or defenses raised in a given action. For example, other incidents of the same type, or involving the same product, could be properly discoverable under the revised standard. Information about organizational arrangements or filing systems of a party could be discoverable if likely to yield or lead to the discovery of admissible information. Similarly, information that could be used to impeach a likely witness, although not otherwise relevant to the claims or defenses, might be properly discoverable. In each instance, the determination whether such information is discoverable because it is relevant to the claims or defenses depends on the circumstances of the pending action.**

The rule change signals to the court that it has the authority to confine discovery to the claims and defenses asserted in the pleadings, and signals to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings. In general, it is hoped that reasonable lawyers can cooperate to manage discovery without the need for judicial intervention. When judicial intervention is invoked, the actual scope of discovery should be determined according to the reasonable needs of the action. The court may permit broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested.

The amendments also modify the provision regarding discovery of information not admissible in evidence. As added in 1946, this sentence was

designed to make clear that otherwise relevant material could not be withheld because it was hearsay or otherwise inadmissible. The Committee was concerned that the "reasonably calculated to lead to the discovery of admissible evidence" standard set forth in this sentence might swallow any other limitation on the scope of discovery. Accordingly, this sentence has been amended to clarify that information must be relevant to be discoverable, even though inadmissible, and that discovery of such material is permitted if reasonably calculated to lead to the discovery of admissible evidence. As used here, "relevant" means within the scope of discovery as defined in this subdivision, and it would include information relevant to the subject matter involved in the action if the court has ordered discovery to that limit based on a showing of good cause.

Finally, a sentence has been added calling attention to the limitations of subdivision (b)(2)(i), (ii), and (iii). These limitations apply to discovery that is otherwise within the scope of subdivision (b)(1). The Committee has been told repeatedly that courts have not implemented these limitations with the vigor that was contemplated. *See 8 Federal Practice & Procedure* § 2008.1 at 121. This otherwise redundant cross-reference has been added to emphasize the need for active judicial use of subdivision (b)(2) to control excessive discovery. *Cf. Crawford-El v. Britton*, [523 U.S. 574] (1998)(quoting Rule 26(b)(2)(iii) and stating that "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly").

Fed. R. Civ. P. 26 advisory committee's notes (emphasis added).

The Court gets the impression from reading the advisory committee's notes that the amendment was not intended to exclude a delineable swath of material so much as it is intended to send a signal to district judges to become more hands-on in the process of regulating -- mostly limiting -- discovery on relevance grounds alone. The "two effects" of the 2000 amendments might, thus, be only one effect: directing district judges to roll up their sleeves and manage discovery, and to do so on a relevance basis. The change in substantive scope from "subject matter" to "claim or defense" would, therefore, seem to "add teeth" to the relevance standard instead of narrowing that standard. Fed. R. Civ. P. 26 advisory committee's notes. It is not surprising that the Supreme Court of the United States of America and Congress would want to increase judicial presence: "relevance" is a liberal concept in the context of trial. Fed. R. Evid.

401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").

Of course, regardless of the Court's musings, courts should also seek to give substantive content to amendments. Read literally, the rule does not permit parties to discover information relevant only to the claim or defense of another party; they must use discovery only to investigate their own claims and defenses. More problematically, however, the rule may prevent using the Federal Rules' compulsory discovery process to obtain "background" information not specifically relevant to any one claim or defense -- e.g., a plaintiff naming a pharmaceutical company as a defendant and then using discovery to educate itself generally about medicine, biochemistry, and the drug industry by using the defendant's expertise.

In In re Cooper Tire & Rubber Co., 568 F.3d 1180 (10th Cir. 2009), the United States Court of Appeals for the Tenth Circuit clarified that the 2000 Amendments to rule 26 "implemented a two-tiered discovery process; the first tier being attorney-managed discovery of information relevant to any claim or defense of a party, and the second being court-managed discovery that can include information relevant to the subject matter of the action." 568 F.3d at 1188. The Tenth Circuit further stated that,

> when a party objects that discovery goes beyond that relevant to the claims or defenses, "the court would become involved to determine whether the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action." This good-cause standard is intended to be flexible. When the district court does intervene in discovery, it has discretion in determining what the scope of discovery should be. "[T]he actual scope of discovery should be determined according to the reasonable needs of the action. The court may permit broader discovery in a particular case depending on the circumstances of the case, the nature of the claims and defenses, and the scope of the discovery requested."

568 F.3d at 1188-89 (quoting the advisory committee's notes to the 2000 amendments to Fed. R.

Civ. P. 26(b)(1))(citations and footnote omitted)(alteration in original).

The 2015 amendments to rule 26(b)(1) continued this process of narrowing discovery's substantive scope and injecting courts further into the discovery process. The 2015 amendment made notable deletions and additions, both of which emphasize the need to make discovery proportional to the needs of the case. See Fed. R. Civ. P. 26(b)(1). Rule 26(b)(1), provides:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense ~~including the existence, description, nature, custody, condition and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. All discovery is subject to the limitations imposed by Rule 26(b)(2)(C)~~ <u>and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.</u>

Fed. R. Civ. P. 26(b)(1)(alterations added).

The advisory committee notes state that the first deletion does not make a substantive change. Rather, the deletion was made because "[d]iscovery of such matters is so deeply entrenched" in standard discovery that including it would be "clutter." Fed. R. Civ. P. 26(b) advisory committee's note to 2015 amendment.[1]

---

[1]The Court regrets this deletion. Moving things out of the statute's text often creates mischief, especially for courts that rely heavily on the text's plain language. The drafters might be astonished how often the Court sees objections to interrogatories and requests that seek basic information about documents. The rule is well-established because the deleted language was in the rule; now that the language is not in the rule, the rule may be eroded or, more likely, ignored or overlooked by those who do not spend time in the advisory notes' thicket. What the advisory comments describe as "clutter" is a simple instruction to practitioners who do not practice in federal court every day for every case. This deletion might incrementally increase unnecessary

On the second deletion, the Committee Notes explain that the former provision for discovery of relevant but inadmissible information that appears "reasonably calculated to lead to the discovery of admissible evidence" is also deleted.[2]   Fed. R. Civ. P. 26(b) advisory committee's note to 2015 amendment.

> The phrase has been used by some, incorrectly, to define the scope of discovery.  As the Committee Note to the 2000 amendments observed, use of the "reasonably calculated" phrase to define the scope of discovery "might swallow any other limitation on the scope of discovery."  The 2000 amendments sought to prevent such misuse by adding the word "Relevant" at the beginning of the sentence, making clear that "'relevant' means within the scope of discovery as defined in this subdivision. . . ."  The "reasonably calculated" phrase has continued to create problems, however, and is removed by these amendments.  It is replaced by the direct statement that "Information within this scope of discovery need not be admissible in evidence to be discoverable."  Discovery of nonprivileged information not admissible in evidence remains available so long as it is otherwise within the scope of discovery.

Fed. R. Civ. P. 26 advisory committee's note to 2015 amendment.  The deletion, therefore, did not necessarily change discovery's scope, but clarified it.  Accordingly, "[r]elevance is still to be 'construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on' any party's claim or defense."  State Farm Mutual Auto. Ins. Co. v. Fayda, No. 14-9792, 2015 WL 7871037, at *2 (S.D.N.Y. 2015)(Francis IV, M.J.)(quoting Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978)).

The most notable addition to rule 26(b) is the proportionality concept.  Rule 26(b)(2)(C)(iii) has always limited overly burdensome discovery and required proportionality.

---

litigation rather than shorten it.  Some of the amendments seem more designed to help the nation's large corporations, represented by some of the nation's most expensive law firms, cut down expenses than they are to help courts and practitioners in more routine cases.

[2]Arguably, older lawyers will have to learn a new vocabulary and ignore the one they have used for decades.  If the changes were not made to change the scope of discovery, it is unclear what the benefit of all this change is.

See Fed. R. Civ. P. 26(b)(2)(C)(iii)(pre-2015 version). The proportionality requirement was relocated to 26(b)(1) to address the "explosion"[3] of information that "has been exacerbated by the advent of e-discovery."[4] Fed. R. Civ. P. 26(b) advisory committee's note to 2015 amendment. Describing how e-discovery is the driving factor in the 2015 amendment, the Committee Notes state:

> The burden or expense of proposed discovery should be determined in a realistic way. This includes the burden or expense of producing electronically stored information. Computer-based methods of searching such information continue to develop, particularly for cases involving large volumes of electronically stored information. Courts and parties should be willing to consider the opportunities for reducing the burden or expense of discovery as reliable means of searching electronically stored information become available.

Fed. R. Civ. P. 26(b) advisory committee's note to 2015 amendment.

---

[3]It is unclear whether the "explosion" of e-discovery has made discovery harder or easier. In many situations, algorithms and search engines have replaced associates and paralegals, and brought greater accuracy and efficiency to discovery. The days of searching warehouses of documents by looking at them one-by-one may have been a bigger burden than today's e-discovery.

[4]That this relocation effects no substantive change is one reason why the Court is skeptical that the 2015 amendments will significantly limit discovery or cut its costs. Courts brought common sense and proportionality to their discovery decisions long before the 2015 amendments. See Aguayo v. AMCO Ins. Co., 59 F. Supp. 3d 1225, 1275 (D.N.M. 2014)(Browning, J.)("[T]he Court expects that discovery and motion practice bear some proportionality to the case's worth."); Cabot v. Wal-Mart Stores, Inc., No. 11-0260, 2012 WL 592874, at *11-12 (D.N.M. 2012)(Browning, J.)(limiting the scope of discovery because it was unduly burdensome in relation to the relevance and need). The import of the rule is that it will -- apparently by design -- lead to more "proportionality" objections and more disputes that district courts will have to resolve. It is unclear how federal court dockets that are already perilously close to a breaking point can support increased judicial involvement in discovery, and it is also unclear what was wrong with the old goal of largely self-executing discovery. The amendments create another problem: attorneys need to learn the new vocabulary of "proportionality" and use that vocabulary to rewrite stock legal sections in their briefs. Older lawyers in particular must be alert, learn the new rules, read the comments, and understand the thrust of the drafting. Finally, given that "proportionality" is a very subjective standard, it will be hard for any court to sanction properly any attorney for raising this objection. In sum, the rules are just as likely to increase the costs of discovery as to decrease it.

Chief Justice Roberts' 2015 Year-End Report on the Federal Judiciary indicates that the

addition of proportionality to rule 26(b) "crystalizes the concept of reasonable limits on

discovery through increased reliance on the common-sense concept of proportionality."[5]  Chief

Justice John Roberts, 2015 Year-End Report on the Federal Judiciary at 6, Supreme Court of the

---

[5]The Rules Enabling Act, 28 U.S.C. § 2072, empowers the federal courts to prescribe rules for the conduct of their business.  See 28 U.S.C. § 2072.  The Judicial Conference -- the policy making body of the federal judiciary -- has overall responsibility for formulating those rules.  See Chief Justice John Roberts, 2015 Year-End Report on the Federal Judiciary at 6, Supreme Court of the United States, available at http://www.supremecourt.gov/ publicinfo/yearend/year-endreports.aspx ("2015 Year-End Report").  The Chief Justice leads the Judicial Conference.  The Judicial Conference's Committee on Rules of Practice and Procedure, known as the Standing Committee, solicits guidance from advisory committees and conferences to draft proposed rules and amendments for the Judicial Conference's consideration.  See 2015 Year-End Report, at 5-6.  Chief Justice Roberts, a former clerk for Chief Justice William Rehnquist, appointed the Honorable David Campbell, United States District Judge for the District of Arizona, also a former Rehnquist clerk and President George W. Bush appointee, to chair the Civil Rules Advisory Committee.  Campbell and David Levi, Dean of the Duke University School of Law, a former clerk to Justice Lewis Powell, and former chief judge of the United States District Court for the Eastern District of California, appointed as United States Attorney by President Ronald Reagan and appointed to the Eastern District of California by President George W. Bush, led the effort to increase proportionality and hands-on judicial case management in the 2015 amendments.  See Report to the Standing Committee at 4, Advisory Committee on Civil Rules (May 8, 2013), available at http://www.uscourts.gov/rules-policies/archives/committeereports/advisory-committee-rules-civil-procedure-may-2013.  After the Judicial Conference concurred on the 2015 amendments, it sent the proposed rules and amendments to the Supreme Court, which approved them.  Chief Justice Roberts submitted the proposed rules to Congress for its examination.  See 2015 Year-End Report at 6.  Because Congress did not intervene by December 1, the new rules took effect.  Some scholars have noted that the rules reflect the conservative nature of those who have participated in drafting the amendments.  See Edward A. Purcell, Jr., From the Particular to the General: Three Federal Rules and the Jurisprudence of the Rehnquist and Roberts Courts, 162 U. Pa. L. Rev. 1731 (2014); Corey Ciocchetti, The Constitution, The Roberts Court, and Business: The Significant Business Impact of the 2011-2012 Supreme Court Term, 4 Wm. & Mary Bus. L. Rev. 385 (2013).  In particular, the New Mexico Trial Lawyer published an article asserting that the amendments favored corporate defendants, which was partially the result of Chief Justice Roberts' appointment of "corporate-minded judges to the Rules Advisory Committee that drafted the amendments."  Ned Miltenberg & Stuart Ollanik, The Chief Umpire is Changing the Strike Zone, at 1, The New Mexico Trial Lawyer (Jan. /Feb. 2016).  The Court shares some of the concerns with the new amendments being pro-business and giving corporations new tools to limit plaintiffs' discovery.

United States, <u>available at</u> http://www.supremecourt.gov/publicinfo/year-end/year-endreports. aspx ("2015 Year-End Report").  He states that the proportionality concept seeks to "eliminate unnecessary or wasteful discovery," and to impose "careful and realistic assessment of actual need."  2015 Year-End Report at 7.  This assessment may, as a practical matter, require "judges to be more aggressive in identifying and discouraging discovery overuse by emphasizing the need to analyze proportionality before ordering production of relevant information."  <u>State Farm Mutual Auto. Ins. Co. v. Fayda</u>, 2015 WL 7871037, at *2 (internal quotation marks omitted).  The burden of demonstrating relevance remains on the party seeking discovery, and the newly revised rule "does not place on the party seeking discovery the burden of addressing all proportionality considerations."  Fed. R. Civ. P. 26(b)(1) advisory committee's notes to 2015 amendment.  <u>See</u> <u>Dao v. Liberty Life Assurance Co. of Boston</u>, No. 14-4749, 2016 WL 796095, at *3 (N.D. Cal. February 23, 2016)(LaPorte, M.J.)(observing that the 2015 amendment "reinforces the Rule 26(g) obligation of the parties to consider these factors in making discovery requests, responses or objections"); <u>Williams v. U.S. Envt'l Servs.</u>, LLC, No. 15-0168, 2016 WL 617447, at *1 n.2 (M.D. La. February 16, 2016)(Bourgeois, M.J.).  In general, "the parties' responsibilities [] remain the same" as they were under the rule's earlier iteration so that the party resisting discovery has the burden of showing undue burden or expense.  Fed. R. Civ. P. 26(b)(1) advisory committee's notes to 2015 amendment.  <u>See</u> <u>Dao v. Liberty Life Assurance Co. of Boston</u>, 2016 WL 796095, at *3 (noting that, "while the language of the Rule has changed, the amended rule does not actually place a greater burden on the parties with respect to their discovery obligations").

Like with the 2000 amendments, it is unsurprising that the drafters are unable to articulate precise language narrowing the discovery's substantive scope.  Instead of being

Aristotelian and trying to draft rules, the drafters largely opt to make federal judges Plato's enlightened guardians. They have decided that no single general rule can adequately take into account the infinite number of possible permutations of different claims, defenses, parties, attorneys, resources of parties and attorneys, information asymmetries, amounts in controversy, availabilities of information by other means, and other factors. They have dropped all discovery disputes into judges' laps. The drafters have decided that this determination requires the individualized judgment of someone on the scene, and that presence is what the rulemakers want when they: (i) encourage district judges to take a firmer grasp on the discovery's scope; and (ii) put their thumbs on the scale in favor of narrower discovery in the rule's definition of the scope of discovery.

Rule 34 allows a party to serve requests to produce certain items "on any other party . . . in the responding party's possession, custody, or control." Fed. R. Civ. P. 34(a)(1). See Hickman v. Taylor, 329 U.S. at 504 (explaining that rule 34 "is limited to parties to the proceeding, thereby excluding their counsel or agents"). Applying this standard, courts have found that corporations control documents in their subsidiaries' hands, clients control case files in their attorneys' hands, and patients control health records in their healthcare providers' hands. See Simon v. Taylor, No. 12-0096, 2014 WL 6633917, at *35 (D.N.M. November 18, 2014)(Browning, J.)(citing United States v. Stein, 488 F. Supp. 2d 350, 360-62 (S.D.N.Y. 2007)(Kaplan, J.)); CSI Inv. Partners II, L.P. v. Cendant Corp., 2006 WL 617983, at *6 (S.D.N.Y. March 13, 2006)(Eaton, M.J.)(compelling a client's attorney to disclose documents in the attorney's possession regarding the attorney's representation of that particular client, but only insofar as the documents were relevant). An employee's or corporation's ability to access the documents in the normal course of business weighs in favor of finding control. See, e.g., Gerling

Int'l Ins. Co. v. Comm'r of Internal Revenue, 839 F.2d 131, 140-41 (3d Cir. 1988)(stating that where "agent-subsidiary can secure documents of the principal-parent to meet its own business needs . . . the courts will not permit the agent-subsidiary to deny control for purposes of discovery"); Camden Iron & Metal v. Marubeni America Corp., 138 F.R.D. 438, 441 (D.N.J. 1991)(including "demonstrated access to documents in the ordinary course of business" in list of factors to be considered in determining control).  Applying that standard, the Court, in Simon v. Taylor, determined that a racing commission had legal control over test samples from horses, because the commission "has the legal right to have those horses' samples tested upon demand." 2014 WL 6633917, at *35.  In another case, the Court concluded that an oil company had control over the payroll records a third-party payroll company possessed, because the oil company had the practical ability to request that payroll company, which it contracted with, to produce those payroll records on demand.  See Landry v. Swire Oilfield Serv. LLC, No. 16-0621, 2018 WL 279749, at *19 (D.N.M. January 3, 2017)(Browning, J.).

    Courts have specifically considered whether clients control information in their attorneys' hands.  Because a client has the right "to obtain copies of documents gathered or created by its attorneys pursuant to their representation of that client, such documents are clearly within the client's control."  Am. Soc. For Prevention of Cruelty to Animals v. Ringling Bros. and Barnum & Bailey Circus, 233 F.R.D. 209, 212 (D.D.C. 2006)(Facciola, M.J.).  See Poppino v. Jones Store Co., 1 F.R.D. 215, 219 (W.D. Mo. 1940)("It is quite true that if an attorney for a party comes into possession of a document as attorney for that party his possession of the document is the possession of the party.")(emphasis in original).  Consequently, a party may be required to produce a document that it has given to its attorney when the document relates to the attorney's representation of that client on a specific matter.  See In re Ruppert, 309 F.2d 97, 98 (6th Cir.

1962)(per curiam); <u>Hanson v. Garland S.S. Co.</u>, 34 F.R.D. 493, 495 (N.D. Ohio 1964)(Connell,

J.)(concluding that witness statements which a party's attorney takes in preparation of the case

were within the party's control and subject to production under rule 34 on a proper showing);

<u>Kane v. News Syndicate Co.</u>, 1 F.R.D. 738, 738-39 (S.D.N.Y. 1941)(Mandelbaum,

J.)(determining that a plaintiff in an action for copyright infringement could require the

defendants' attorneys to produce a document from which the plaintiff hoped to ascertain whether

material had been obtained from his copyrighted works).

> The mere fact, however, that the attorney for a party has possession of a document does not make his possession of the document the possession of the party. The paper may be one of his private papers which he had before the relation of attorney and client was established. It is inconceivable that he should be required to produce such a paper for the inspection of his client's adversary. The paper which he has in his possession may be the property of some other client. It is inconceivable that he should be compelled to produce the document belonging to another client because the adversary of one of his clients demands it.

<u>Poppino v. Jones Store Co.</u>, 1 F.R.D. at 219. <u>See</u> <u>Hobley v. Burge</u>, 433 F.3d 946 (7th Cir.

2006)(observing that a party may not have had control over its former attorney's documents);

<u>Ontario Inc. v. Auto Enterprises, Inc.</u>, 205 F.R.D. 195 (E.D. Mich. 2000). Simply put, if a

person, corporation, or a person's attorney or agent can pick up a telephone and secure the

document, that individual or entity controls it. <u>See</u> <u>Simon v. Taylor</u>, 2014 WL 6633917, at *34

("Control is defined as the legal right to obtain documents upon demand.").

## <u>LAW REGARDING PROTECTIVE ORDERS</u>

"Federal district courts have broad discretion over discovery." <u>Morales v. E.D. Etnyre &</u>

<u>Co.</u>, 229 F.R.D. 661, 662 (D.N.M. 2005)(Browning, J.). The trial court has discretion to grant a

protective order pursuant to rule 26(c) of the Federal Rules of Civil Procedure. <u>See</u> <u>Morales v.</u>

<u>E.D. Etnyre & Co.</u>, 229 F.R.D. at 663. Rule 26(c) provides that, upon a showing of good cause,

a court may "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," which may include forbidding disclosure or discovery. Fed. R. Civ. P. 26(c)(1)(A). Accord Miller v. Regents of the Univ. of Colo., 188 F.3d 518 (Table), 1999 WL 506520, at *12 (10th Cir. 1999)("The district court is in the best position to weigh these variables and determine the appropriate limits because, unlike an appellate court, the district court has the ability to view firsthand the progression of the case, the litigants, and the impact of discovery on parties and nonparties.").

"It is the party seeking the protective order who has the burden to show good cause for a protective order." Velasquez v. Frontier Med. Inc., 229 F.R.D. 197, 200 (D.N.M. 2005)(Browning, J.). The party seeking the protective order must submit "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." Gulf Oil Co. v. Bernard, 452 U.S. 89, 102 n.16 (1981)(internal quotation marks omitted).

Although rule 26(c) is silent regarding the time within which the movant must file for a protective order, "the United States Court of Appeals for the Tenth Circuit has held that a motion under rule 26(c) for protection . . . is timely filed if made before the date set for production." Montoya v. Sheldon, No. CIV 10-0360, 2012 WL 2383822, at *5 (D.N.M. June 8, 2012)(internal quotation marks and brackets omitted)(citing In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig., 669 F.2d 620, 622 n.2 (10th Cir. 1982)).

## LAW REGARDING SHIFTING DISCOVERY COSTS

Under the discovery rules, "the presumption is that the responding party must bear the expense of complying with discovery requests." Oppenheimer Fund, Inc. v. Sanders, 437 U.S. at 358. A person from whom discovery is sought can, however, "invoke the district court's discretion under Rule 26(c) to grant orders protecting him from 'undue burden or expense' . . .

including orders conditioning discovery on the requesting party's payment of the costs of discovery." Oppenheimer Fund, Inc. v. Sanders, 437 U.S. at 358 (quoting Fed. R. Civ. P. 26(c)). In cases involving electronic discovery, the Southern District of New York has stated that "[a] court should consider cost-shifting *only* when electronic data is relatively inaccessible, such as in backup tapes," Zubulake v. UBS Warburg, LLC, 217 F.R.D. 309, 324 (S.D.N.Y. 2003)(Scheindlin, J.)(emphasis in original), and that, when a court considers cost shifting, it should consider eight factors:

> (1) the specificity of the discovery requests; (2) the likelihood of discovering critical information; (3) the availability of such information from other sources; (4) the purposes for which the responding party maintains the requested data (5) the relative benefit to the parties of obtaining the information; (6) the total cost associated with production; (7) the relative ability of each party to control costs and its incentive to do so; and (8) the resources available to each party,

Rowe Entertainment, Inc. v. William Morris Agency, Inc., 205 F.R.D. 421, 429 (S.D.N.Y. 2002)(Francis IV, M.J.). See Zubulake v. UBS Warburg, LLC, 217 F.R.D. at 316 ("By far, the most influential response to the problem of cost-shifting relating to the discovery of electronic data was given by United States Magistrate Judge James C. Francis IV of this district in *Rowe Entertainment*."). See also Radian Asset Assur., Inc. v. College of Christian Bros. of N.M., 2010 WL 4928866, at *5 (D.N.M. Oct. 22, 2010)(Browning, J.)("In the context of cost-shifting, courts have held that the cost of producing data weighed against the likely relevance of the data determines whether cost-shifting is appropriate.").

## LAW REGARDING THE FTCA

It is "axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." United States v. Mitchell, 463 U.S. 206, 212 (1983)(citations omitted). See Garcia v. United States, 709 F. Supp. 2d 1133, 1137 (D.N.M.

2010)(Browning, J.)("The United States cannot be sued without its consent."); id. at 1137-38

("Congressional consent -- a waiver of the traditional principle of sovereign immunity -- is a

prerequisite for federal-court jurisdiction.").  The law generally places the burden of proving

federal jurisdiction on the proponent of jurisdiction, and the party bringing suit against the

United States thus similarly bears the burden of proving that sovereign immunity has been

waived.  See James v. United States, 970 F.2d 750, 753 (10th Cir. 1992).  See also Garcia v.

United States, 709 F. Supp. 2d at 1138 ("The plaintiff bears the burden of proving that Congress

has waived sovereign immunity for all of his claims.").  A waiver of sovereign immunity cannot

be implied and must be unequivocally expressed.  See United States v. Nordic Vill., Inc., 503

U.S. 30, 33-34 (1992); United States v. Mitchell, 445 U.S. 535, 538 (1980); United States v.

Murdock Mach. & Eng'g Co. of Utah, 81 F.3d 922, 930 (10th Cir. 1996).

        The Tenth Circuit has emphasized that all dismissals for lack of jurisdiction, including

those for a failure to establish a waiver of sovereign immunity under the FTCA, should be

without prejudice.   See Mecca v. United States, 389 F. App'x 775, 780 (10th Cir.

2010)(unpublished).  It has explained: "A longstanding line of cases from this circuit holds that

where the district court dismisses an action for lack of jurisdiction . . . the dismissal must be

without prejudice."  Mecca v. United States, 389 F. App'x at 780 (quoting Brereton v. Bountiful

City Corp., 434 F.3d 1213, 1216 (10th Cir. 2006)).  The Tenth Circuit held in Mecca v. United

States that the district court improperly dismissed with prejudice the plaintiff's FTCA claims

after it concluded that it lacked jurisdiction over those claims.  See 389 F. App'x at 780-81

("Here, because the district court found itself without jurisdiction over the FTCA claims,

dismissal should have been entered without prejudice, even if the court deemed further

amendment futile.  We therefore remand with instructions to enter dismissal of these claims

without prejudice.").

The FTCA waives the United States' sovereign immunity for some tort actions against the United States seeking money damages. See Romanach v. United States, 579 F. Supp. 1017, 1019 (D.P.R. 1984)(Laffitte, J.). In enacting the FTCA, Congess waived the United States' sovereign immunity as to

> claims against the United States, for money damages accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be held liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b). "The FTCA's waiver of sovereign immunity is limited, however." Cortez v. EEOC, 585 F. Supp. 2d 1273, 1284 (D.N.M. 2007)(Browning, J.). "If the claim does not fall within the FTCA's express provisions, or if it falls within one of its exceptions, the claim is not cognizable under the FTCA, and the court must deny relief." Cortez v. EEOC, 585 F. Supp. 2d at 1284 (citing Williams v. United States, 50 F.3d 299, 304-05 (4th Cir. 1995)). Moreover, the only proper party in an action under the FTCA is the United States. See 28 U.S.C. § 2679(a); Romanach v. United States, 579 F. Supp. at 1018 n.1 (holding that no suit under the FTCA may lie against any agency of the United States eo nomine); Painter v. FBI, 537 F. Supp. 232, 236 (N.D. Ga. 1982)(Forrester, J.)(holding that "[t]he FBI may not be sued eo nomine").

Even when the FTCA waives the United States' sovereign immunity, the United States is liable for FTCA claims, if at all, only "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. "The law of the place where the alleged negligent conduct took place determines the scope of employment under the FTCA." Garcia v. United States, 2010 WL 2977611, at *18 (D.N.M. June 15, 2010)(Browning, J.)(citing

28 U.S.C. § 1346(b)).  See Richards v. United States, 369 U.S. 1, 9 (1962); Williams v. United

States, 350 U.S. 857, 857 (1955); Henderson v. United States, 429 F.2d 588, 590 (10th Cir.

1970)).  Accordingly, "the United States is placed in the same position as a private individual by

rendering the United States liable for the tortious conduct of its employees if such conduct is

actionable in the state in which the United States' action or inaction occurred."  Cortez v. EEOC,

585 F. Supp. 2d at 1284.

The Supreme Court has rejected a reading of the FTCA that would impose liability on the

United States only "to the same extent as would be imposed on a private individual 'under the

same circumstances.'"  Indian Towing Co. v. United States, 350 U.S. 61, 65 (1955)(quoting 28

U.S.C. § 2674)("The Government reads that statute as if it imposed liability to the same extent as

would be imposed on a private individual 'under the same circumstances.' But the statutory

language is 'under like circumstances[]' . . . .").  The FTCA did not spur "the creation of new

causes of action but acceptance of liability under circumstances that would bring private liability

into existence."  Feres v. United States, 340 U.S. 135, 141 (1950).  It is important for a court to

consider the United States' liability under all circumstances presented in the case as opposed to

selectively considering only a few of the circumstances.  See Feres v. United States, 340 U.S. at

141-42.  The Supreme Court has illustrated:

> One obvious shortcoming in these claims is that plaintiffs can point to no liability
> of a "private individual" even remotely analogous to that which they are asserting
> against the United States.  We know of no American law which ever has
> permitted a soldier to recover for negligence, against either his superior officers or
> the Government he is serving.  Nor is there any liability "under like
> circumstances," for no private individual has power to conscript or mobilize a
> private army with such authorities over persons as the Government vests in
> echelons of command.  The nearest parallel, even if we were to treat "private
> individual" as including a state, would be the relationship between the states and
> their militia.  But if we indulge plaintiffs the benefit of this comparison, claimants
> cite us no state, and we know of none, which has permitted members of its militia

to maintain tort actions for injuries suffered in the service, and in at least one state the contrary has been held to be the case. It is true that if we consider relevant only a part of the circumstances and ignore the status of both the wronged and the wrongdoer in these cases we find analogous private liability. In the usual civilian doctor and patient relationship, there is of course a liability for malpractice. And a landlord would undoubtedly be held liable if an injury occurred to a tenant as the result of a negligently maintained heating plant. But the liability assumed by the Government here is that created by "all the circumstances," not that which a few of the circumstances might create. We find no parallel liability before, and we think no new one has been created by, this Act. Its effect is to waive immunity from recognized causes of action and was not to visit the Government with novel and unprecedented liabilities.

Feres v. United States, 340 U.S. at 141-42 (footnotes omitted).

The United States' liability is coextensive with that of private individuals under the respective states' law, even if comparable government actors would have additional defenses or additional obligations under that state's law. See Ewell v. United States, 776 F.2d 246, 248-49 (10th Cir. 1985); Proud v. United States, 723 F.2d 705 (9th Cir. 1984)("But appellants overlook the fact that in enacting the FTCA, Congress -- not the Hawaii Legislature -- determined the tort liability of the United States. And the FTCA specifically provides that the federal government's tort liability is co-extensive with that of a private individual under state law."); Cox v. United States, 881 F.2d 893, 895 (10th Cir. 1989)(citing Proud v. United States with approval and stating that "[t]his and other courts have applied the same rationale in holding that the United States may invoke the protection of a [private] recreational use statute"). The Tenth Circuit illustrated some of these same principles in Ewell v. United States:

The main goal of the FTCA was to waive sovereign immunity so that the federal government could be sued as if it were a private person for ordinary torts. Congress was primarily concerned with allowing a remedy where none had been allowed. There is no evidence that Congress was concerned with the prospect that immunities created solely for private persons would shield the United States from suit. The Supreme Court, in United States v. Muniz, 374 U.S. 150 . . . (1963), considered whether it is appropriate to apply immunities created by state law to the United States when it is sued under the FTCA. The Court was concerned with

state laws that immunized prison officials from suits by prisoners and concluded that it is "improper to limit suits by federal prisoners because of restrictive state rules of immunity." 374 U.S. at 164 . . . . The immunity under consideration in that case applied to state, county and municipal prison officials. Noting its decision in <u>Indian Towing Co. v. United States</u>, 350 U.S. at 65 . . . wherein the Court determined that federal liability had to be determined as if it were a private person and not as if it were a municipal corporation, it concluded that state law immunity applicable to state, county and municipal prison officials would not be applicable to a private person and, therefore, not applicable to the federal government in a suit under the FTCA.

Thus, while immunities afforded state, county and municipal employees are not applicable to the federal government when sued under the FTCA, immunities created by state law which are available to private persons will immunize the federal government because it is liable only as a private individual under like circumstances. It is evident, therefore, that the Utah district court was correct in granting the motion for summary judgment.

<u>Ewell v. United States</u>, 776 F.2d at 249.

In a unanimous decision, the Supreme Court recently reversed "a line of Ninth Circuit precedent permitting courts in certain circumstances to base a waiver" under the FTCA "simply upon a finding that local law would make a 'state or municipal entit[y]' liable." <u>United States v. Olson</u>, 546 U.S. 43, 44 (2005)(internal citation omitted). As the Supreme Court discussed in <u>United States v. Olson</u>, the United States Court of Appeals for the Ninth Circuit based its decision to find a waiver of liability under the FTCA on two principles:

In this case, two injured mine workers (and a spouse) have sued the United States claiming that the negligence of federal mine inspectors helped bring about a serious accident at an Arizona mine. The Federal District Court dismissed the lawsuit in part upon the ground that their allegations were insufficient to show that Arizona law would impose liability upon a private person in similar circumstances. The Ninth Circuit, in a brief per curiam opinion, reversed this determination. It reasoned from two premises. First, where "'unique governmental functions'" are at issue, the Act waives sovereign immunity if "'a state or municipal entity would be [subject to liability] under the law [. . .] where the activity occurred.'" Second, federal mine inspections being regulatory in nature are such "'unique governmental functions,'" since "there is no private-sector analogue for mine inspections." The Circuit then held that Arizona law would make "state and municipal entities" liable in the circumstances alleged;

hence the FTCA waives the United States' sovereign immunity.

546 U.S. at 45 (alterations in original)(citations omitted).  The Supreme Court "disagree[d] with both of the Ninth Circuit's legal premises."  United States v. Olson, 546 U.S. at 45.  Regarding the first premise, the Supreme Court held:

> The first premise is too broad, for it reads into the Act something that is not there.  The Act says that it waives sovereign immunity "under circumstances where the United States, if a private person," not "the United States, if a state or municipal entity," would be liable.  Our cases have consistently adhered to this "private person" standard.  In *Indian Towing Co. v. United States*, this Court rejected the Government's contention that there was "no liability for negligent performance of 'uniquely governmental functions.'"  It held that the Act requires a court to look to the state-law liability of private entities, not to that of public entities, when assessing the Government's liability under the FTCA "in the performance of activities which private persons do not perform."  In *Rayonier Inc. v. United States*, the Court rejected a claim that the scope of FTCA liability for "'uniquely governmental'" functions depends on whether state law "imposes liability on municipal or other local governments for the negligence of their agents acting in" similar circumstances.  And even though both these cases involved Government efforts to escape liability by pointing to the absence of municipal entity liability, we are unaware of any reason for treating differently a plaintiff's effort to base liability solely upon the fact that a State would impose liability upon a municipal (or other state governmental) entity.  Indeed, we have found nothing in the Act's context, history, or objectives or in the opinions of this Court suggesting a waiver of sovereign immunity solely upon that basis.

United States v. Olson, 546 U.S. at 45-46 (citations omitted).

The Supreme Court rejected the Ninth Circuit's second premise based on the following rationale:

> The Ninth Circuit's second premise rests upon a reading of the Act that is too narrow. The Act makes the United States liable "in the same manner and to the same extent as a private individual under like circumstances."  As this Court said in *Indian Towing*, the words "'like circumstances'" do not restrict a court's inquiry to the same circumstances, but require it to look further afield.  The Court there considered a claim that the Coast Guard, responsible for operating a lighthouse, had failed "to check" the light's "battery and sun relay system," had failed "to make a proper examination" of outside "connections," had "fail[ed] to check the light" on a regular basis, and had failed to "repair the light or give warning that the light was not operating."  These allegations, the Court held, were

analogous to allegations of negligence by a private person "who undertakes to warn the public of danger and thereby induces reliance." It is "hornbook tort law," the Court added, that such a person "must perform his 'good Samaritan' task in a careful manner."

United States v. Olson, 546 U.S. at 46 (alterations in original).

The Court has not located any Tenth Circuit decisions that have discussed the related principles enunciated in United States v. Olson. The United States Court of Appeals for the Third Circuit has since held, relying on United States v. Olson: "Under the FTCA, the federal government can only be held liable for breaches of duties imposed on private, rather than state, parties." DeJesus v. U.S. Dep't of Veterans Affairs, 479 F.3d 271, 283 n.9 (3d Cir. 2007). The United States Court of Appeals for the Fifth Circuit has held, also relying on United States v. Olson: "Because the federal government could never be exactly like a private actor, a court's job in applying the standard is to find the most reasonable analogy. Inherent differences between the government and a private person cannot be allowed to disrupt this analysis." In re FEMA Trailer Formaldehyde Prod. Liab. Litig. (Miss. Plaintiffs), 668 F.3d 281, 288 (5th Cir. 2012)(citations omitted).

According to one commentator, courts have generally had little difficulty in finding a comparable factual analogy in the private sector for conduct in which the United States engages: "Although, as indicated above, courts have generally had little difficulty in finding sufficiently analogous private conduct, there have been exceptions, primarily in cases involving 'quasi-legislative' actions, such as administrative rulemaking, and in cases involving law enforcement officials, who, unlike private citizens, are required to make arrests in appropriate situations." 2 L. Jayson & R. Longstreth, Handling Federal Tort Claims § 9.08[1], at 9-219 (2011). The Tenth Circuit has stated: "It is virtually axiomatic that the FTCA does not apply where the claimed

negligence arises out of the failure of the United States to carry out a [federal] statutory duty in the conduct of its own affairs." United States v. Agronics Inc., 164 F.3d 1343, 1345 (10th Cir. 1999). It recognized that "[o]ther courts invoke the same rule by the shorthand expressions of immune 'quasi-legislative' or 'quasi-judicial' action." United States v. Agronics Inc., 164 F.3d at 1345.

Thus, for example, courts have rejected FTCA claims premised upon such administrative/regulatory acts or omissions as: (i) the Federal Aviation Administration's failure to take enforcement action against an entity not complying with federal laws and rules; (ii) the United States Department of Agriculture's failure to prohibit the exportation of disease-exposed cattle; and (iii) various agencies' noncompliance with proper rulemaking procedures. See United States v. Agronics Inc., 164 F.3d at 1346 (citations omitted)(finding no FTCA waiver for "the unauthorized division of regulatory jurisdiction between two administrative agencies").

The Court examined the exceptions to the FTCA's waiver of sovereign immunity in Coffey v. United States, 906 F. Supp. 2d 1114, 1157 (D.N.M. 2012)(Browning, J.). In that case, a plaintiff brought a wrongful death and negligence action against the Bureau of Indian Affairs based on its decision to contract with a county detention center. See 906 F. Supp. 2d at 1121. The United States argued against liability on the grounds that the detention center was an independent contractor and that the United States' decision to contract with it fell within the FTCA's discretionary-function exemption. See 906 F. Supp. 2d at 1121. The Court agreed on both points. See 906 F. Supp. 2d at 1121. It explained that the BIA's decision to contract with the detention center was "a matter of the BIA's judgment and choice, which is susceptible to policy analysis," and thus protected under the discretionary function exemption. 906 F. Supp. 2d at 1157. It added that the United States "is liable under the FTCA for the actions of its

employees only," thereby prohibiting liability for the detention center's actions. 906 F. Supp. 2d at 1164.

<u>ANALYSIS</u>

The Court will not quash the Begays' subpoena to Leider. That subpoena does not offend rule 45(d)(3)(A)(iii), because it does not request privileged information. <u>See</u> Response at 1; Reply at 1. The subpoena does not impose an undue burden, because it requests a class of documents -- nonprivileged documents "relating to proceedings before the Drug Enforcement Administration (DEA) for Dr. Annicol Marrocco from 2013-2015," <u>see</u> Response at 3 -- that is not voluminous, <u>see</u> Tr. at 4:13-14 (Schofield)(estimating "about two banker's boxes full of documents"), and the Begays have few resources, <u>see</u> Tr. at 8:20-24 (Zedalis)("The Begays are a family of limited means. They don't have running water. . . . They don't have a structure on their property."); Fed. R. Civ. P. 26(b)(1)(stating that whether discovery is "proportional to the needs of the case" depends, in part, on "the parties' resources"). Despite the inconvenience, there is no sound reason to shift the costs of a manageable document review -- particularly from a lawyer and law firm that are well equipped to conduct such a review -- to the Begays' attorneys, who are representing the Begays on a contingency-fee basis.

The Court also sees no sound reason to depart from the presumption that "the responding party must bear the expense of complying with discovery requests." <u>Oppenheimer Fund, Inc. v. Sanders</u>, 437 U.S. at 358. It therefore will not order the Begays to pay Marrocco's or Leider's costs. The Court will, however, permit Marrocco and Mr. Leider to redact the name of the patient involved in Marrocco's DEA investigation -- even though Marrocco did not ask for such redactions as a form of relief in the Motion -- because the Plaintiffs orally agreed to those redactions at the Court's hearing. <u>See</u> Tr. at 4:4-6 (Court, Zedalis).

**IT IS ORDERED** that the Motion to Quash Plaintiffs' Subpoena, filed March 30, 2017

(Doc. 110) is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Margaret Moses Branch
Branch Law Firm
Albuquerque, New Mexico

--and--

Seth T. Cohen
Cynthia Zedalis
Cohen & Zedalis LLP
Santa Fe, New Mexico

  *Attorneys for the Plaintiffs*

James A. Tierney
 Acting United States Attorney
Erin Langenwalter
Christopher F. Jeu
 Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

  *Attorneys for the Defendant*